**Christopher Lee KENNY, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 14–06–00764–CR.

Court of Appeals of Texas, Houston (14th Dist.).

Sept. 27, 2007.

Discretionary Review Refused April 30, 2008.

Bob Wicoff, Houston, TX, for appellant.

Bridget Holloway, Houston, for appellee.

Panel consists of Justices YATES, SEYMORE, and EDELMAN.*

## MAJORITY OPINION

LESLIE B. YATES, Justice.

A jury convicted appellant Christopher Lee Kenny of kidnapping, and the trial court assessed punishment at two years' confinement. In five issues, he challenges the legal and factual sufficiency of the evidence to support the jury's finding on the element of abduction and complains the trial court erred in refusing to instruct the jury on various defenses. We affirm.

## I. Factual and Procedural Background

Appellant and the complainant dated and lived together at a residence in Katy, Texas. On the evening of June 21, 2005, he and the complainant went to dinner at a local restaurant where he drank one-and-a-half bottles of sake and she drank two to three glasses of wine. During dinner, a dispute arose over the couple's finances, and appellant stopped talking to the complainant. After they finished, appellant and the complainant drove home without speaking to one another in the car.

At trial, the complainant and appellant offered differing versions of the events occurring thereafter. The complainant testified that she tried to speak to appellant when they returned home, but he would not respond. After twenty or thirty minutes, without telling appellant, she left and drove to a pub "up the road." The complainant stated that she stayed at the pub for about two or three hours, having approximately three or four glasses of wine and talking to other patrons. At some point, the complainant observed appellant enter the pub, smile and wave at her—which "scared" her—and then sit di-

rectly across from her position at the bar. Later, as appellant approached the complainant to access a cigarette machine located behind her, she asked him why he would not sit by her, and he did not respond. Appellant then returned to his seat, had a drink, talked to other patrons, and smiled at the complainant. She stated that appellant's behavior made her a "little nervous." Appellant left after having a "couple of drinks" and without speaking to the complainant.

Thereafter, a man who the complainant had talked to at the pub offered to give her a ride home. She accepted because she was "tipsy" and felt that she probably should not drive. Around midnight, the man drove her to a rental house he owned, rather than her house, because she explained to him she was nervous about going home because of appellant's behavior. She stayed at the house and drank water with the man for about twenty or twenty-five minutes. After the man made an unsolicited sexual advance at her, which she rejected, he drove her back to her car in the pub's parking lot after midnight.

According to the complainant, when she exited the man's car, she observed appellant standing by her car holding a rope. As she attempted to enter her car, appellant yelled at her, grabbed her arm, pulled her to his pickup truck, opened the truck's passenger door, and forced her inside. The complainant stated that by this point, the man who dropped her off had left the premises, and no one else in the parking lot witnessed these events. She further explained that at this point she could have, but did not remember, trying to get out of the truck. Appellant then walked to the driver's side of his truck, got inside, and began tying the complainant's wrists "extremely tightly" together with the rope.

---

* Senior Justice Richard H. Edelman sitting by assignment.

The complainant reacted by biting appellant on his left forearm. She claimed that appellant then threw her against the seat, pinning her there with his hands, and placed some excess rope from her wrists around her neck for about four or five seconds, which caused her pain and prevented her from breathing. At this point, the complainant, fearing for her life, decided to cooperate with appellant and "[j]ust sit there and let him do what he was going to do to [her]." When appellant released the rope from the complainant's neck, he used it to tie her ankles together in such a way that her ankles and wrists were now connected and he could control the tightness of this connection using the end of the rope.[1] This caused the complainant excruciating pain, which she described as feeling like her "knees [were] coming out of the socket," and she screamed to appellant, "Please stop." According to the complainant, appellant responded, "Wait till I get you home. I'm going to torture you more." Appellant then drove home, using one hand to drive and the other to hold the end of the rope. When they arrived home, the complainant stated that appellant pulled her out of the truck's driver's side and forced her to hop inside as he continued to manipulate the tightness of the rope.

When inside the home, appellant told the complainant to sit down in the kitchen while he made coffee, which he forced her to drink, and he then verbally abused her. She explained that the ropes had loosened now, which allowed her to hold the cup of coffee. Thereafter, according to the complainant, as she began walking up the stairs, she said something to anger appellant, and he "came after" her. In the bedroom, appellant pinned the complainant down on the bed and spanked her. She claimed that appellant then said, "Let's see what stuff he's been doing," and forced his fingers into her vagina. Eventually, appellant and the complainant went to sleep. In the morning, when appellant had left for work, the complainant called her sister to inform her of the previous night's events. Upon her sister's advice, the complainant contacted the police. The complainant also contacted one of her employees, Betty Dudley, who came to her house. Dudley helped the complainant write a statement for the police when they arrived because her wrists were too swollen to write.

On cross-examination, the complainant admitted that after the man had dropped her off in the pub's parking lot, appellant told her, "Why would you go off with a stranger because you could have been hurt like the idiot girl in Aruba?" The complainant further conceded that, when appellant put her inside his truck, she hoped he would just take her home and not harm her, but she explained that she also wanted to drive herself home because she was scared of appellant. With the exception of some details,[2] Dudley, the complainant's sister, two of the police officers who responded to the complainant's call the morning after the incident, and a forensic nurse examiner who examined the complainant's injuries, largely corroborated the complainant's version of the events

---

1. The complainant explained that appellant had "hog-tied" her.

2. The most notable detail involved whether appellant placed the rope around the complainant's neck as she stood outside of her car in the pub's parking lot and then dragged her to his truck, the version that Dudley and the two police officers recalled her recounting. The nurse examiner, on the other hand, recalled the complainant giving the same account as she did at trial, in which appellant pinned her neck against the seat of his truck using the rope.

with their testimony at trial, including injuries to her wrists, ankles, and neck.

According to appellant, who served as the defense's sole witness, he went to the pub looking for the complainant after unsuccessfully trying to reach her on her cell phone. He looked for her for about five minutes after entering the pub and noticed her sitting across from him only after he had ordered a drink and sat down at the bar. He admitted waving to her when he saw her, but denied doing so to intimidate her. When she motioned him to come sit with her, he similarly motioned her to sit by him, but she refused. Upon seeing the complainant summon the bartender to pay her tab, appellant left and drove home, assuming he would see her there later, and went to sleep. He awoke at 1:00 a.m., checked his cell phone, and noticed he had three missed calls from the complainant. He tried to call her, but she did not answer, and, concerned, he decided to drive back to the pub to look for her. Although appellant saw her car parked in the same spot, he could not find her inside the pub. After walking to a nearby convenience store to look for the complainant, he received a call from her stating that she was coming home but failing to specify where she was located. As appellant returned to the pub's parking lot, he observed her walking towards him in an uncoordinated manner from the far end of the lot. Appellant noted that her dress looked disheveled, she had bloodshot, glazed-over eyes, and her breath smelled like "turpentine and cigarettes." Appellant concluded that the complainant was intoxicated and "appeared to be a danger to anything on the road." He told her he was going to drive her home, but she attempted to get in her car and repeated that she was "going home," that he could follow her in his truck, and that she knew how to drive drunk. He claims he then helped her walk to his truck by steadying her with his hands. As appellant attempted to open the passenger side door, the complainant leaned her forehead against the truck with her eyes closed and looked as though she "was kind of drifting off."

After the complainant sat down in the passenger seat and appellant had closed the door, he said to her from outside the vehicle, "It's 1:00 o'clock in the morning. I can't believe this shit." The complainant then opened the passenger's side door, and, while she sat in the truck and he stood outside, an argument ensued in which she reiterated that she knew how to drive drunk and appellant should follow her home. Eventually, appellant shut the door, and walked back to the driver's side of the truck. The complainant again opened the passenger's side door, and a further argument ensued. At this point, because he thought the complainant clearly intended to drive and "didn't see much option," appellant took a work rope from the back of his truck, demanded the complainant put forward her wrists, and formed a loop around her wrists with the rope. Appellant then started the ignition, reversed, and, as he pulled forward, he claims the complainant loosened the rope around her wrists, reached across to the driver's side, and bit his left arm. In response, he pushed her back into her seat. After the complainant repeatedly kicked the glove compartment, appellant eventually retied the complainant's wrists again with the rope and held the end of the rope, and he claims she was "complacent" when he did so. Appellant denied ever tying the complainant's feet together or using the rope to choke her. Appellant further denied ever telling the complainant that he would "torture her more" at home.

Upon arriving home, appellant let the complainant out the driver's side door, untied the rope from her wrists, and helped her inside. He retrieved a chair from the

living room, told her to sit down, and made her coffee. Eventually, when they retired to the bedroom upstairs, the complainant went to the bathroom for twenty minutes and would not respond to appellant's calls for her name. When she came out, appellant claims she made a comment about his lack of concern for where she was, and he "gave her a couple of pops on the hiney" in response. He denied ever placing his fingers inside her vagina.

The State indicted appellant for aggravated kidnapping,[3] initially alleging he "intentionally and knowingly abduct[ed] ... the Complainant, ... without [her] consent, with intent to prevent [her] liberation by secreting and holding [her] in a place where [she] was not likely to be found and with intent to violate and abuse [her] sexually and terrorize ... and inflict bodily injury on [her]." The State later modified the indictment to allege that appellant "intentionally and knowingly abduct[ed] ... the Complainant, ... with intent to violate and abuse [her] sexually and inflict bodily injury on [her]." At the close of evidence at trial, the trial court charged the jury on aggravated kidnapping and the lesser-included offenses of kidnapping and unlawful restraint but refused appellant's request to instruct the jury on the defenses of necessity, protection of life or health, and confinement as justifiable force. The jury acquitted appellant of aggravated kidnapping but convicted him of kidnapping.

Appellant now complains the evidence is legally and factually insufficient to support the jury's finding on the abduction element of kidnapping and that the trial court erred in refusing to instruct the jury on the defenses to kidnapping.

## II. Legal and Factual Sufficiency

In issues one and two, appellant contends the evidence is both legally and factually insufficient to support the jury's finding that appellant abducted the complainant. In evaluating a legal sufficiency claim attacking a jury's finding of guilt, we view the evidence in the light most favorable to the verdict. *Wesbrook v. State,* 29 S.W.3d 103, 111 (Tex.Crim.App.2000). We do not ask whether we believe the evidence at trial established guilt beyond a reasonable doubt. *Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Rather, we determine only whether a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Cardenas v. State,* 30 S.W.3d 384, 389 (Tex.Crim. App.2000). In our review, we accord great deference " 'to the responsibility of the trier of fact [to fairly] resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.' " *Clewis v. State,* 922 S.W.2d 126, 133 (Tex.Crim.App.1996) (quoting *Jackson,* 443 U.S. at 319, 99 S.Ct. 2781).

In conducting a factual sufficiency review of the jury's determination, we do not view the evidence "in the light most favorable to the prosecution." *Cain v. State,* 958 S.W.2d 404, 407 (Tex.Crim.App.1997). Rather, we look at all evidence in a neutral light and will reverse only if (1) the evidence is so weak that the finding seems clearly wrong and manifestly unjust or, (2) considering conflicting evidence, the finding, though legally sufficient, is nevertheless against the great weight and preponderance of the evidence. *See Watson v. State,* 204 S.W.3d 404, 414–15 (Tex.Crim. App.2006). However, it is not enough that

---

3. The State also indicted appellant for sexual assault, and the jury ultimately acquitted him of this charge.

we may harbor a subjective level of reasonable doubt to overturn a finding that is founded on legally sufficient evidence. *See id.* at 417. We cannot conclude that a finding is "clearly wrong" or "manifestly unjust" simply because, on the quantum of evidence admitted, we would have voted differently had we been the fact finder. *See id.* Nor can we declare that a conflict in the evidence justifies a new trial simply because we may disagree with the factfinder's resolution of that conflict. *See id.* Rather, before ordering a new trial, we must first be able to say, with some objective basis in the record, that the great weight and preponderance of the (albeit legally sufficient) evidence contradicts the verdict. *See id.*

A person commits kidnapping if he intentionally or knowingly abducts another person. TEX. PENAL CODE ANN. § 20.03(a) (Vernon 2003). "Abduct" means to restrain a person with intent to prevent his liberation by (a) secreting or holding him in a place where he is not likely to be found or (b) using or threatening to use deadly force. *See id.* § 20.01(2) (Vernon 2003). Appellant contends there is legally and factually insufficient evidence that he intended to prevent the complainant's liberation by secreting or holding her in a place where she was not likely to be found under section 20.01(2)(A) of the Penal Code. He correctly notes that the application paragraph of the court's charge on kidnapping expressly limits the manner of abduction to "secreting" under section 20.01(2)(A); as such, he contends the State may not now rely on the "deadly force" manner of abduction under section 20.01(2)(B). Notwithstanding the jury charge, he argues "in an abundance of caution" that there is legally and factually insufficient evidence to support a finding of abduction under a "deadly force" theory. We address appellant's sufficiency arguments under the alternative theories of abduction in turn.

## A. Secreting

The requirement of secreting the victim or holding her in a place where she is not likely to be found is a part of the mens rea of the offense, not the actus reus. *Brimage v. State,* 918 S.W.2d 466, 475–76 (Tex.Crim.App.1994). Thus, once restraint has been proven, the offense of kidnapping is complete when the actor evidences a specific intent to prevent liberation in this manner. *See id.* Accordingly, the State need not prove the actor accomplished a restraint by secretion but only that the actor completed a restraint and evidenced a specific intent to prevent liberation by secretion. *See id.* at 476. Intent can be inferred from an accused's conduct, remarks, and the surrounding circumstances. *See Turner v. State,* 600 S.W.2d 927, 929 (Tex.Crim.App.1980); *Murchison v. State,* 93 S.W.3d 239, 254 (Tex.App.-Houston [14th Dist.] 2002, pet. ref'd).

Appellant argues that the evidence shows only that appellant intended to take the complainant to their home and that it is "hard to imagine a situation where taking someone to his or her residence can be consistent with having the intent to secrete them in a place they were not likely to be found." The State counters that the Court of Criminal Appeals has held that a moving car can constitute a place where the victim is not likely to be found under section 20.01(2)(A). *See Sanders v. State,* 605 S.W.2d 612, 614 (Tex.Crim.App.1980); *see also Wilson v. State,* 863 S.W.2d 59, 66–67 (Tex.Crim.App.1993); *Fann v. State,* 696 S.W.2d 575, 576 (Tex.Crim.App.1985). Thus, the State argues, appellant both expressed the required intent to secrete the complainant and completed the abduction when he forced the complainant into his truck, and his later act of taking her back

their residence does not negate such abduction.

We agree with appellant that there is legally and factually insufficient evidence that he intended to prevent the complainant's liberation by secreting or holding her in a place where she was not likely to be found. The crux of appellant's case rested on his stated intention to drive the complainant back to their home, and no testimony or other evidence controverted appellant's statements. Indeed, the complainant testified that appellant told her he intended to take her home—albeit to "torture" her—and that she desired to drive herself home.[4] The State does not cite, and we have not found, any authority holding that a victim's own residence can constitute a "place where [the victim] is unlikely to be found" and that, by extension, an expressed intention to take the victim home could satisfy the secreting requirement under section 20.01(2)(A). *See Schweinle v. State*, 915 S.W.2d 17, 19 (Tex.Crim.App.1996) (holding that rational jury could have believed that defendant's house, where complainant was held against her will, did not constitute place where complainant was not likely to be found because there was evidence that complainant had key to house, had formerly lived there, and had spent night there past three or four nights before offense). Even assuming a victim's own residence could constitute such a place under the statute, we do not find any facts in this record to justify such a conclusion here.

Moreover, we reject the State's suggestion that the evidence shows appellant intended to secrete or hold the complainant in his truck and that appellant had thus completed the abduction before transporting her back to their home. While we agree that a moving car can constitute a place the victim will not likely be found, we find the cases the State cites in support of this assertion distinguishable. *Wilson*, *Fann*, and *Sanders* each involved strangers abducting children and driving them either aimlessly around a city or to an unfamiliar, remote destination, which effectively isolated the victims from those who could find or assist them. *See Wilson*, 863 S.W.2d at 66–67; *Fann*, 696 S.W.2d at 576; *Sanders*, 605 S.W.2d at 613–14. From this conduct and the surrounding circumstances, the courts inferred that the appellants intended to secrete or hold the victims in a place where they were unlikely to be found. Here, however, appellant drove his adult girlfriend directly from a local pub to their nearby residence, a place she desired to go and that, as noted, does not constitute a place where she was unlikely to be found under these facts. More importantly, unlike the above cases where the courts inferred intent to secrete largely from the appellants' conduct and the surrounding circumstances, appellant repeatedly verbalized his intent to take the complainant to their home. Indeed, the evidence indicates that appellant and the complainant primarily disputed how she would go home, not whether she would go home. Additionally, there is no evidence that appellant affirmatively sought to isolate the complainant from people who could potentially render aid to her. *Compare Megas v. State*, 68 S.W.3d 234, 237 (Tex.App.-Houston [1st Dist.] 2002, pet. ref'd) (finding legally and factually sufficient evidence

---

4. We acknowledge that the Court of Criminal Appeals has held that voluntarily accompanying a defendant into a vehicle does not preclude the possibility that the defendant may kidnap the victim during the ride, but neither party suggests that the complainant in fact voluntarily accompanied appellant into his truck before he drove home. *See Boyle v. State*, 820 S.W.2d 122, 138 (Tex.Crim.App. 1989).

of intent to secrete where, during physical and verbal altercation in which appellant's girlfriend attempted to exit appellant's parked car on side of highway, appellant dragged girlfriend back into car and drove away from motorist who had stopped to render aid). Based on appellant's conduct, his remarks, and the unusual circumstances surrounding the incident, we cannot conclude that one could reasonably infer that appellant intended to secrete or hold the complainant in his truck within the meaning of section 20.01(2)(A). *See Turner*, 600 S.W.2d at 929; *Murchison*, 93 S.W.3d at 254.

We therefore hold that there is legally insufficient evidence that appellant abducted the complainant with intent to prevent her liberation by secreting or holding her in a place where she was not likely to be found. We now turn to the alternative "deadly force" manner of abduction under section 20.01(2)(B).

## B. Using or Threatening Deadly Force

■ We initially address whether we may review the sufficiency of the evidence of abduction under the alternative "deadly force" definition in section 20.01(2)(B) in light of the indictment and charges presented to the jury. The abstract portion of the aggravated kidnapping jury charge includes both the secreting and deadly force definitions of abduction, and the application paragraph simply invokes the term "abduct." The abstract portion of the kidnapping charge defines the offense using the term "abducts"; however, the application paragraph of the charge reads, "[I]f you find from the evidence beyond a reasonable doubt that ... [appellant] ... unlawfully, intentionally or knowingly abduct [the complainant], without her consent, *with intent to prevent her liberation by secreting or holding [the complainant] in a place where [she] was not likely to be*

*found,* then you will find [appellant] guilty of kidnapping" (emphasis added). Therefore, the application paragraph of the jury charge on kidnapping expressly authorized a conviction only under the secreting manner of abduction pursuant to section 20.01(2)(A). For this reason, appellant contends we may not conduct a sufficiency review of the jury's findings on abduction under the alternative deadly force definition in section 20.01(2)(B).

However, the Court of Criminal Appeals has established that we do not measure the sufficiency of the evidence by the jury charge actually given but, rather, by the elements of the offense as defined by the hypothetically correct jury charge. *See Malik v. State*, 953 S.W.2d 234, 239–40 (Tex.Crim.App.1997); *see also Gollihar v. State*, 46 S.W.3d 243, 252 (Tex.Crim.App. 2001). Such a charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. The "law" as "authorized by the indictment" is the statutory elements of the offense as modified by the charging instrument. *See Curry v. State*, 30 S.W.3d 394, 404 (Tex.Crim.App.2000). This standard ensures that a judgment of acquittal is reserved for those situations in which there is an actual failure in the State's proof of the crime rather than a mere error in the jury charge submitted. *See Malik*, 953 S.W.2d at 240.

■ The question thus becomes whether the hypothetically correct jury charge on kidnapping would include the deadly force manner of abduction in addition to secreting. The aggravated kidnapping indictment alleged abduction without specifying the particular statutory manner or means of establishing abduction out-

lined in section 20.01(2). Although the State must generally specify the type of abduction it seeks to prove, appellant did not move to quash the indictment or otherwise object to its validity, and thus, he may not now allege the indictment was flawed for failing to give him notice of the charges. *See Teal v. State*, 230 S.W.3d 172, 176–78 (Tex.Crim.App.2007) (holding that defendant must object to any error in indictment before trial); *Curry*, 30 S.W.3d at 403 ("[T]he State must allege, *in the face of a motion to quash*, which type of abduction it seeks to prove in order to give the defendant notice." (emphasis added)); *Fann*, 696 S.W.2d at 576 (rejecting argument that indictment was fundamentally defective for failing to define "abduct" where appellant failed to file motion to quash). Therefore, because the aggravated kidnapping indictment is not restricted to either manner of abduction under section 20.01(2), we conclude the hypothetically correct jury charge would authorize conviction for the lesser-included offense of kidnapping under either theory of abduction. *See Malik*, 953 S.W.2d at 240 (holding that hypothetically correct jury charge "does not unnecessarily restrict the State's theories of liability"); *see also Swartz v. State*, 61 S.W.3d 781, 785–86 (Tex.App.-Corpus Christi 2001, pet. ref'd) (applying hypothetically correct jury charge analysis and conducting sufficiency review under principal and party theories of credit card abuse where indictment and abstract portion of jury charge alleged both theories but application paragraph alleged only party theory); *Marvis v. State*, 3 S.W.3d 68, 73–74 (Tex.App.-Houston [14th Dist.] 1999) (applying hypothetically correct jury charge analysis and conducting sufficiency review under party theory of murder where application paragraph alleged only principal theory), *rev'd on other grounds*, 36 S.W.3d 878 (Tex.Crim.App.2001); *Howard v. State*, 966 S.W.2d 821, 824–25 (Tex.App.-Austin 1998, pet. ref'd) (applying hypothetically correct jury charge analysis and conducting sufficiency review under party theory of attempted murder where charge included party instruction but application paragraph did not).[5]

■ Having determined that the hypothetically correct jury charge would have authorized a conviction for kidnapping under the deadly force manner of abduction, we now address whether there is legally and factually[6] sufficient evidence to support a conviction under such theory. Abduction under section 20.01(2)(B) is established by evidence that a party intended to prevent the complainant's liberation by using or threatening to use deadly force. *See* Tex. Penal Code Ann. § 20.01(2)(B). "Deadly force" is either force intended or known by the actor to cause death or serious bodily injury or force capable of causing death or serious bodily injury in the manner of its use or intended use. *See Ferrel v. State*, 55 S.W.3d 586, 591–92 (Tex.Crim.App.2001). Threats may be communicated by actions, words, or deeds, including "acts amounting to an offer to use future force." *See Rogers v. State*, 550 S.W.2d 78, 81 (Tex.Crim.App.1977).

5. *Compare Curry*, 30 S.W.3d at 405 (holding that hypothetically correct charge would have included deadly force allegation under *Malik*, where indictment alleged deadly force theory of abduction but jury charge omitted such allegation and failed to specify theory of abduction).

6. We continue to apply the hypothetically correct jury charge analysis to both legal and factual sufficiency reviews until otherwise directed by the Court of Criminal Appeals. *See Wooley v. State*, 223 S.W.3d 732, 735 n. 1 (Tex.App.-Houston [14th Dist.] 2007, pet. filed); *Villani v. State*, 116 S.W.3d 297, 307 (Tex.App.-Houston [14th Dist.] 2003, pet. ref'd).

Appellant claims there is no evidence he intended to prevent the complainant's liberation by using deadly force because he only spanked, tied up, and verbally abused her, all of which he suggests were not capable of causing death or serious bodily injury. He further contends there is no evidence he intended to prevent her liberation by threatening deadly force because his only conceivable threat, his alleged statement that he would torture the complainant when they returned home, came after he had restrained her and was thus not intended to prevent her liberation. He additionally asserts that even if he made the torture threat, it was simply an aside, frustrated "brow-beating," and, given that actual torture did not accompany the comment, the context indicates "it was never meant to be taken literally."

We disagree with appellant's contentions for several reasons. First, appellant ignores the complainant's testimony that he placed the rope around her neck for four or five seconds, at which point she stated she could not breath and her "life flashed before [her] eyes." Although appellant denied ever placing the rope around her neck, the jury was free to believe the complainant's testimony over appellant's, and her recollection that appellant placed the rope around her neck finds corroboration in both testimony from the officers, Dudley, and the nurse and a medical report showing a six-centimeter "point tenderness" injury to the front of her neck.[7] *See Duvall v. State,* 59 S.W.3d 773, 778 (Tex.App.-Austin 2001, pet. ref'd) (holding that choking complainant constituted sufficient act to establish threat of deadly force); *Ramos v. State,* No. 14–94–01188–CR, 1997 WL 59333, at *2–3 (Tex.App.-Houston [14th Dist.] Feb. 13, 1997, pet. ref'd) (not designated for publication) (holding that rational jury could conclude appellant intended to prevent victim's liberation by use of deadly force where he, among other things, drove her to isolated location and strangled her until she lost consciousness). Second, in contending that his threat to torture the complainant could not have prevented her liberation, appellant disregards the complainant's testimony that he made the threat shortly after she had bitten him on the arm, which the jury could have rationally inferred was an attempt to liberate herself. Finally, as to appellant's contention that his threat to torture the complainant was never meant to be taken literally, such a determination goes to the weight and credibility of the evidence, and we conclude that a rational factfinder could have determined, based on appellant's prior assaultative conduct, that appellant's threat was credible. *See, e.g., Lebleu v. State,* 192 S.W.3d 205, 208–12 (Tex.App.-Houston [14th Dist.] 2006, pet. ref'd) (rejecting appellant's contentions that evidence was legally and factually insufficient to support intentional threat of harm element of retaliation because evidence showed his threats were mere "puffing" and that he often made dramatic statements, as it was jury's role to evaluate competing theories as to meaning of appellant's words).

We therefore hold that there is legally and factually sufficient evidence that appellant abducted the complainant with intent to prevent her liberation by using or threatening deadly force and accordingly overrule issues one and two. Because we find sufficient evidence to support appellant's conviction for kidnapping, we must

---

7. The forensic nurse examiner explained that a "point tenderness" injury represents an area on the body that the victim reports as tender and that touching may cause the victim to jump or flinch. She conceded that point tenderness injuries contain no visible signs of injury.

now turn to whether the trial court nonetheless committed reversible error in refusing to instruct the jury on defenses to kidnapping.

### III. Defenses

In issues three through five, appellant complains that the trial court erroneously refused to submit instructions he requested on the defenses of necessity, protection of life or health, and confinement as justifiable force to the jury. An accused is entitled to an instruction on every defensive issue raised by the evidence. *Hayes v. State*, 728 S.W.2d 804, 807 (Tex.Crim.App.1987). This is true regardless of whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of this evidence. *Id.* A defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the jury charge. *Id.* We review the evidence in support of the defensive issue in the light most favorable to the defense. *See Stefanoff v. State*, 78 S.W.3d 496, 501 (Tex.App.-Austin 2002, pet. ref'd).[8]

Finding significant overlap between each of the defenses raised by appellant, we will address them together. Regarding the defense of necessity, the Penal Code provides that conduct is justified if

(1) the actor reasonably believes the conduct is immediately necessary to avoid imminent harm;

(2) the desirability and urgency of avoiding the harm clearly outweigh, according to ordinary standards of reasonableness, the harm sought to be prevented by the law proscribing the conduct; and

(3) a legislative purpose to exclude the justification claimed for the conduct does not otherwise plainly appear.

TEX. PENAL CODE ANN. § 9.22 (Vernon 2003). Regarding the defense of protection of life or health, the Penal Code provides that "[a] person is justified in using force, but not deadly force, against another when and to the degree he reasonably believes the force is immediately necessary to prevent the other from committing suicide or inflicting serious bodily injury to himself." *Id.* § 9.34(a) (Vernon 2003). Therefore, both defenses share the common element of "immediate necessity."[9] " 'Imminent' means something that is impending, not pending; something that is on the point of happening, not about to happen." *Schier v. State*, 60 S.W.3d 340, 343 (Tex.App.-Houston [14th Dist.] 2001, pet. ref'd). "An 'imminent harm' occurs when there is an emergency situation and it is 'immediately necessary' to avoid that harm, when a split-second decision is required without time to consider the law." *Id.* A defendant's belief that conduct was immediately necessary to avoid imminent harm may be deemed unreasonable as a matter of law if undisputed facts demon-

---

8. The parties debate whether appellant admitted the offense charged, which is required to raise the defense of necessity. *See Young v. State*, 991 S.W.2d 835, 838 (Tex.Crim.App. 1999). Because this issue does not affect the outcome of our decision, we need not address it.

9. Although we find no authority specifically addressing whether the immediate necessity requirement under section 9.22 and section 9.34 are governed by the same principles,

both parties have so assumed in their briefs to this court. *See generally McGarity v. State*, 5 S.W.3d 223, 225 (Tex.App.-San Antonio 1999, no pet.) (noting that protection of life or health defense and necessity defense both constitute "justification" defenses under Chapter 9 and analogizing authority addressing necessity in analyzing issue involving protection of health or life). As such, they have waived the right to complain otherwise. *See* TEX.R.APP. P. 33.1(a).

strate a complete absence of evidence of immediate necessity or imminent harm. *Arnwine v. State*, 20 S.W.3d 155, 160 (Tex. App.-Texarkana 2000, no pet.); *Brazelton v. State*, 947 S.W.2d 644, 648–49 (Tex.App.-Fort Worth 1997, no pet.). Regarding the "defense" of confinement as justifiable force, the Penal Code provides that confinement is justified when force is justified under Chapter Nine of the Code if the actor takes reasonable measures to terminate the confinement as soon as he knows he safely can unless the person confined has been arrested for an offense. *See* TEX. PENAL CODE ANN. § 9.03 (Vernon 2003); *see also Adelman v. State*, 828 S.W.2d 418, 421 (Tex.Crim.App.1992).

Appellant contends that "there clearly was some evidence that the Complainant was about to drive herself home," which necessitated her restraint because of the probable result that someone would "get[ ] hurt" if she drove in her intoxicated condition. He notes that the complainant admitted she was going to get in her car, that she stated she wanted to drive herself home, and that she attempted to exit the vehicle twice before appellant restrained her. He argues that this evidence shows he "was reasonable in concluding that the Complainant had every intention to drive herself home and would do it soon."

In contending that the complainant was "about to" drive and would drive "soon," appellant misinterprets the very definitions of "immediate[ ] necessity" and "imminent harm," which expressly exclude an event that is "about to happen." *See Schier*, 60 S.W.3d at 343. Indeed, the record reveals a complete absence of immediate necessity or imminent harm. Appellant testified that he and the complainant had argued for at least five minutes before he tied her wrists together when she attempted to exit his vehicle for the second time. As such, his own testimony fails to indicate

he made the decision to restrain the complainant in a split-second without time to consider any legal alternatives, such as requesting her car keys. *See Fuentes v. State*, No. 11–05–00003–CR, 2006 WL 648343, at *2 (Tex.App.-Eastland Mar. 16, 2006, pet. ref'd) (not designated for publication) (holding trial court properly refused necessity instruction in assault case for failure to raise fact issue on immediate necessity or imminent harm where appellant wrestled his wife for car keys for twenty minutes in attempt to keep her from driving car they occupied while intoxicated and slapped her when vehicle was not moving and keys were not in ignition); *Jordan v. State*, No. 03–02–00041–CR, 2002 WL 31083349, at *2–3 (Tex.App.-Austin Sept. 19, 2002, no pet.) (not designated for publication) (holding trial court properly refused necessity instruction in assault case for failure to raise fact issue on immediate necessity or imminent harm because (1) when appellant tussled with his intoxicated girlfriend at their home to prevent her from taking his car keys and driving, there was no evidence she was on verge of driving away, (2) appellant waited five minutes after she left on foot to look for her, and, (3) when appellant later found her at convenience store, there was no evidence she was in imminent peril).

Because the record reveals a complete absence of evidence on the elements of immediate necessity or imminent harm, we hold that the trial court properly refused to instruct the jury on the defenses of necessity under section 9.22 and protection of life or health under section 9.34. Additionally, because appellant concedes that an instruction regarding confinement as justifiable force under section 9.03 would only be appropriate if an instruction under section 9.34 were, we conclude that, by extension, the trial court properly refused

to instruct the jury on confinement as justifiable force under section 9.03.

We overrule issues three through five.

## IV. Conclusion

We hold that the evidence is legally insufficient to support appellant's conviction for kidnapping under the secreting theory of abduction included in the actual jury charge. However, we hold that the evidence is legally and factually sufficient to support appellant's conviction under the deadly force theory of abduction, based on the hypothetically correct jury charge. Finally, we hold that the trial court properly refused the instructions on defenses to kidnapping because the evidence shows a lack of immediate necessity or imminent harm. Accordingly, we affirm the trial court's judgment.

RICHARD H. EDELMAN, Senior Justice, dissenting.

I disagree with the Majority Opinion's conclusion that the evidence was legally insufficient to prove an intent to prevent liberation by secretion because the victim's own residence could not be, or was not, a place where she was not likely to be found.

As relevant to this issue, the abduction element of kidnaping means to restrain a person with the intent to prevent his liberation by secreting or holding him in a place where he is not likely to be found. See Tex. Pen.Code Ann. § 20.01(2)(A) (Vernon Supp.2006), § 20.03(a) (Vernon 2003). Importantly, the secreting or holding of the victim in a place where she is not likely to be found is solely part of the intent element, not the conduct element. See Brimage v. State, 918 S.W.2d 466, 475–76 (Tex.Crim.App.1994). Therefore, it is not necessary for the State to prove that a restraint is accomplished by secreting or holding the victim in such a place, but only that a restraint occurred, and the defen-

dant evidenced an intent to prevent liberation in that manner. Mason v. State, 905 S.W.2d 570, 575 (Tex.Crim.App.1995); Brimage, 918 S.W.2d at 476. Rather, when a defendant keeps a person isolated with an intent to prevent the victim's liberation by anyone who might be capable of helping the victim, abduction is proven, and "the claim that the person was not held in a place where the person was not likely to be found is of no importance." Wilson v. State, 863 S.W.2d 59, 66 (Tex.Crim.App. 1993).

In this case, the evidence showed that appellant forced the complainant into his pickup truck, bound her, and took her to their home where he restrained and assaulted her. This evidence is sufficient to prove appellant's intent to prevent the complainant's liberation by anyone capable of helping her, regardless of the location. See, e.g., People v. Pasch, 152 Ill.2d 133, 178 Ill.Dec. 38, 604 N.E.2d 294 (1992)(noting that a person can be secretly confined as effectively in her own home as in a remote and isolated location). The Majority's interpretation that someone can be kidnapped in his own home only with an intent to use deadly force, and not an intent to secret, is not indicated by the statutory language or case law and produces an absurd result. Therefore, I would overrule appellant's challenge to the sufficiency of the evidence to prove a restraint with intent to prevent liberation by secreting or holding the complainant in a place where she was not likely to be found.