COURT OF APPEALS

                                                 SECOND
DISTRICT OF TEXAS

                                                                FORT
WORTH

 

 

                                        NO.
2-08-312-CR

 

 

JOHN YOUNG                                                                     APPELLANT

 

                                                   V.

 

THE STATE OF TEXAS                                                                STATE

 

                                              ------------

 

            FROM
THE 362ND DISTRICT COURT OF DENTON COUNTY

 

                                              ------------

 

                                MEMORANDUM OPINION[1]

 

                                              ------------

Appellant
John Young brings nine points in this appeal from his conviction by a jury for
two counts of aggravated kidnapping, enhanced by two prior felony
convictions.  We affirm.








Legal
and Factual Sufficiency

Because
appellant challenges the legal and factual sufficiency of the evidence in his
eighth point, we review that point first.

Background Facts

Carlton
Adger testified that on the night of February 22, 2006, he and his girlfriend,
Sharice Brodie, were driving northbound on I-35 on their way to Denton.  Carlton was sleeping.  Sharice woke him because two cars driving
next to them looked as if they were about to wreck.  One of the cars, a Suburban, was going fast
and swerving; it collided with a Honda next to it and ran up against the
median.[2]  Carlton identified photographs of the
Suburban offered by the State.  Carlton
had Sharice pull over so that they could check and see if anyone in the
Suburban had been injured.








Sharice
stayed in the car while Carlton started walking toward the Suburban.  At that point, Carlton saw someone he later
identified as appellant Acome from around the [S]uburban
and jog, then . . . slow[] down like a fast walk, . . . and approach[]@
him.  Carlton said appellant was in a big
hurry, as if he were trying to get away from the scene.  Appellant seemed to be in a state of shock,
and he told Carlton to A[g]et back in the car.@[3]  As appellant said this, he was holding his
hand up and had something covering it; he waved his hand as if he had a
gun.  Carlton could tell Ait
wasn't his finger because it was something that stopped short in [a] towel or a
shirt or something . . . and made it seem as if he had a weapon.@  The towel was stiff, stuck out, and didn=t
move.  Carlton believed appellant had a
gun, but he did not actually see a gun. 








After
Carlton realized that appellant had what he thought was a gun, Carlton became
afraid.  If appellant had concealed a gun
under the towel, the barrel would have been pointing at Carlton.  Carlton got back in the passenger side front
seat, and appellant got into the passenger side back seat.  Carlton told Sharice to drive, and they drove
for about five to seven minutes.  She
drove to the La Quinta in Lewisville, off Corporate Drive.  Carlton had suggested to appellant that they
could let him out there just to get him out of the car.  Appellant said, A[F]ine.  Okay.@[4]  Then he darted out of the car and said thank
you.  According to Carlton, appellant Apretty
much was trying to, basically, get away.@

As they
drove, appellant kept saying, A[M]y
partner is going to be mad at me, I done wrecked his car.@  Appellant smelled strongly of alcohol.  Carlton realized, based on appellant=s level
of agitation, that he must have done something else wrong other than a hit and
run.  It made him scared.

Carlton
identified State=s exhibits 4 and 5 as the sports
jersey and black pants appellant was wearing that night.

Sharice
testified that around 11:00 on February 22, 2006, she was driving on I-35 near
the intersection with the George Bush turnpike in Carrollton, when she saw an
SUV behind her car; it came up on her car fast, swerved into the next lane, and
hit the car in front of her.  She
identified the Suburban shown in State=s
exhibits thirty-three through thirty-five as the SUV. Sharice said that when
the cars collided, the Suburban went to the left and the car went to the
right.  She pulled over to the left-side
shoulder of the highway.








When
Carlton got out of the car,[5]
Sharice saw him walking toward the back; she could hear him asking the SUV
driver if he was okay.  She did not see
anything unusual until Carlton got into the car, followed by appellant.
Appellant had his hand wrapped in Aa towel
or some kind of shirt@ and he was carrying a Crown
Royal bag.  She could not say what was
underneath, but she thought appellant had a gun and she was scared.

According
to Sharice, appellant asked her and Carlton to hurry up and drop him off at La
Quinta because he had a friend that lived in an apartment in the area.[6]  He seemed nervous because he had wrecked the
Suburban, which he had borrowed from a friend. 
He said he should not have fallen asleep at the wheel.  He seemed to be in a hurry and smelled of
liquor.  It took about five to seven
minutes for them to get to the La Quinta.

According
to Sharice, the parking lot at the La Quinta was dark and no one was around;
she was afraid because it was late and she was pregnant at the time.[7]  She said although there was light shining on
the hotel itself, there was not any in the parking lot where they were
parked.  When appellant got out, he was
polite and hurried up and around the side of the building.








Gary
Fernandez, a detective with the City of Carrollton police, investigated the
offense against Carlton and Sharice.  He
obtained and executed a search warrant for the Suburban.  He found evidence linking appellant to a
robbery that had occurred at a Sonic in nearby Coppell immediately before the
accident; specifically, he found a cell phone under the driver=s seat
that the robber had taken from the cook at the Sonic.[8]  According to Detective Fernandez, there was
no fingerprint evidence; he did not know if that was because the Suburban had
not been dusted for fingerprints or if no prints were found.  Detective Fernandez also confirmed that if
Sharice had driven from the wreck to Lewisville, she would have crossed the
county line from Dallas to Denton County.








Detective
Scott Peters, a Coppell police officer, testified that he investigated the
Sonic robbery and participated in the investigation of the offense against
Carlton and Sharice.  He obtained a search
warrant for appellant=s residence and also was present
when police searched appellant=s
Mitsubishi.  Lewisville, Carrollton, and
Coppell police all worked together in handling the investigation.  Detective Peters identified State=s
exhibits thirty-eight through forty-three as photographs of the Mitsubishi and
items found in it:  among them, a towel
and a shoe box with a black bag containing money inside.

Detective
Peters identified State=s exhibit forty-four as a
shoebox found in appellant=s
apartment; a BB gun was found inside. 
According to Detective Peters, the BB gun was similar to a .45 or 9
millimeter semiautomatic weapon in size, shape, and color.  He testified that such a weapon is capable of
causing death or serious bodily injury, depending on where the person was shot.

Detective
Peters also testified that the jersey, pants, stocking cap, and hat police
found in appellant=s apartment matched those worn
by the man in the surveillance video from the Sonic.

Detective
Robert Feagins, a police officer for the City of Lewisville, testified that on
February 22, 2006, he learned of a robbery at a Sonic in Coppell[9]
with a gold Suburban involved.  Based on
the information he received, he went to a location in Lewisville where he met
with the vehicle owner, Roosevelt Sanders, who admitted to having driven the
Suburban that day.








Detective
Feagins also spoke with Carollton police officers, who were talking to Carlton
and Sharice; he had the officers and Carlton and Sharice come to a parking lot
outside Sanders=s workplace to see if Carlton
and Sharice could identify Sanders as the person who had been driving the
Suburban.  They said he was not the same
man.  Detective Feagins then showed them Aphoto
lineups [he] happened to have with [him] of an additional suspect.@[10]  He spread these photo arrays out on the
trunk.  One of the photographs was of
appellant; Carlton and Sharice identified him as the driver of the Suburban.[11]  This identification occurred approximately
thirty minutes after the wreck.








Carlton
and Sharice told Detective Feagins that they had been driving northbound on
l-35 and that they had stopped for a wreck in front of them to see if anyone
needed assistance.  Appellant approached
them with a towel over his hand as if he were trying to hide something under it
and demanded that they give him a ride to Lewisville.  Because they thought he had a handgun under
the towel, and therefore felt threatened, they drove him to the La Quinta on
I-35 in Lewisville, which was probably two miles away from where they stopped
due to the wreck.  In doing so, they
crossed the boundary from Dallas County into Denton County, and most of the
travel time occurred in Denton County.

Detective
Feagins contacted a supervisor with the information that Carlton and Sharice
had identified appellant, and Lewisville police officers later took him into
custody.  Detective Feagins interviewed
appellant at the Lewisville Police Department. 
A recording of the interview was admitted into evidence at trial.

Appellant
initially denied having been anywhere other than his apartment on February 22,
2006.  However, he later admitted that
Sanders had let him drive the Suburban and that he had had a wreck in it.  He denied having a gun with him but admitted
that he had asked Carlton and Sharice to Adrop him
off at the house@ and that they drove him to the
La Quinta.








Detective
Feagins showed appellant the same photo array he showed the complainants, and
appellant picked number 5 as the picture of himself, which is the photo Carlton
and Sharice identified.  The Lewisville
police also searched appellant=s
vehicle, a green Mitsubishi, for evidence; they found money related to the
Sonic robbery and a towel.  The cash was
in twenties and was banded with yellow stickies and thin white bands with a
blue stripe.  The detective testified
that Sonic, not the police department, put the bands and stickies on the
money.  Detective Feagins testified that
the towel fit the description given him by the complainants.  It was also large enough to cover a handgun
if someone were holding one.

According
to Detective Feagins, he was familiar with the route from the Sonic to the
crash scene and that if a person were driving fast, it would take about eight
minutes to make that drive.

On
cross-examination, Detective Feagins admitted that appellant and Sanders were
similar looking and that Sanders had initially lied and said the gold Suburban
had been stolen.  Nevertheless, he did
not attempt to confirm Sanders=s
statements about his whereabouts during the time of the Sonic robbery.[12]  Detective Feagins also affirmed that the
Suburban was impounded by Carrollton police and that he did not order it to be
searched to look for evidence in the charged kidnappings.  But he did find out from the Carrollton
investigator that a telephone had been found in the Suburban.








Detective
Feagins acknowledged on redirect that there was no indication from any of the
witnesses to the Sonic robbery that a second man was involved.  In addition, he focused on appellant instead
of Sanders in the investigation because he was investigating appellant in two
prior incidents, which he suspected appellant of being involved in, partly because
the two locations were located close to appellant=s
apartment and were easily accessible to appellant=s
apartment through a hole in the fence. 
Additionally, the manager of the apartment complex gave Detective
Feagins information that led him to believe that appellant, not Sanders, was
the suspect in the Sonic robbery.  He
believed appellant walked, rather than drove, during the prior incidents.  Finally, appellant=s and
Sanders=s
descriptions of appellant=s borrowing the gold Suburban
corresponded.  Detective Feagins did not
think Sanders would have had time to commit the robbery on his own, switch cars
with appellant, and then appellant be in the wreck Aminutes
later.@[13]

Detective
Feagins confirmed that Carlton and Sharice did not say that they ever saw a gun
in appellant=s hand.

Several
witnesses testified to appellant=s
involvement in the Sonic robbery; he does not challenge the legal and factual
sufficiency of that evidence on appeal.








Analysis

Appellant
contends that the evidence is insufficient to show that he abducted either
Carlton or Sharice by restraining them with the intent to prevent their
liberation by threatening to use deadly force. 
With regard to Sharice, appellant contends the evidence shows that she
was only acting at Carlton=s
direction and that he never pointed whatever was under the towel at her.  As to Carlton, he claims that there was no
threat of deadly force because Carlton did not know what was under the towel.  Appellant contends that Carlton and Sharice
were, at most, Atemporarily inconvenienced@ by his
actions.

Applicable Law








To prove
aggravated kidnapping as alleged here, the State had to show that appellant
intentionally or knowingly abducted Carlton and Sharice with the intent to
facilitate his flight from the robbery. 
Tex. Penal Code Ann. ' 20.04(a)(3)
(Vernon 2003); Franks v. State, 90 S.W.3d 771, 792 (Tex. App.CFort
Worth 2002, pet. ref=d, untimely filed).  AAbduct@ as
alleged in this case means to restrain a person with the intent to prevent
liberation by threatening deadly force. 
Tex. Penal Code Ann. ' 20.01(2)(B)
(Vernon Supp. 2009).  ARestrain@ means
to restrict a person=s movement without consent so as
to interfere substantially with his or her liberty by moving him or her from
one place to another.  Id. ' 20.01(1).  Restraint
by force or intimidation is Awithout
consent.@  Id. '
20.01(1)(A).  ADeadly force@ is
either force intended or known by the actor to cause death or serious bodily
injury or force capable of causing death or serious bodily injury in the manner
of its use or intended use.  See
Ferrel v. State, 55 S.W.3d 586, 591B92 (Tex.
Crim. App. 2001); Kenny v. State, 292 S.W.3d 89, 98 (Tex. App.CHouston
[14th Dist.] 2007, pet. ref=d).  Threats
may be communicated by actions, words, or deeds, including Aacts
amounting to an offer to use future force.@  See Rogers v. State, 550 S.W.2d
78, 81 (Tex. Crim. App. 1977).

Legal Sufficiency








We
conclude and hold that the evidence is legally sufficient to support appellant=s
conviction of aggravated kidnapping of both Sharice and Carlton.  The
jury could have reasonably inferred that appellant had used the BB gun found in
his apartment during the Sonic robbery, that he still had the BB gun with him
after the wreck, and that he put a towel over it, using it to intimidate
Carlton and Sharice by threatening to use deadly force.  Carlton testified that he thought appellant
had a gun, and there was testimony that a BB gun can be a deadly weapon,
depending on proximity and location when it is fired.  See Adame v. State, 69 S.W.3d
581, 581B82 (Tex.
Crim. App. 2002); In re R.D., No. 08-07-00100-CV, 2009 WL 638260, at *3
(Tex. App.CEl Paso Mar. 12, 2009, pet.
filed).  Carlton testified that appellant
did not ask, but rather told, him to AGo@ and AGet in
the car,@ all the
while pointing something at him that looked like a concealed gun.  That appellant did not point whatever object
he was concealing at Sharice is not relevant; his pointing the item at Carlton
was an attempt to influence Sharice=s
actions by threatening deadly force against Carlton because they were traveling
together.  See Jenkins v. State,
248 S.W.3d 291, 293B94 (Tex. App.CHouston
[1st Dist.] 2007, pet. ref=d).  Accordingly,
based on the appropriate standard of review, we hold that the evidence is
legally sufficient to sustain the verdict as to both counts.  See Jackson v. Virginia, 443
U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Clayton v. State, 235 S.W.3d
772, 778 (Tex. Crim. App. 2007).

Factual
Sufficiency

For the
same reasons, we conclude and hold that, even considered in a neutral light,
the evidence is not so weak that the jury=s
determination is clearly wrong and manifestly unjust.  See Lancon v. State, 253 S.W.3d
699, 704 (Tex. Crim. App. 2008); Watson v. State, 204 S.W.3d 404, 414B15, 417
(Tex. Crim. App. 2006).  Based on the
testimony of Carlton and Sharice, the physical evidence recovered by the
police, and the testimony linking appellant to the Sonic robbery, the jury=s
verdict was based on permissible, reasonable inferences.  We overrule appellant=s eighth
point.








Culpable
Mental State

In his
fifth through seventh points, appellant challenges the trial court=s
failure to instruct the jury on the culpable mental state for the offense and
the proper definition of Aabduct.@  He thus contends that the entire charge was
defective because it allowed the jury to convict on less than the required
statutory elements.

Standard of Review

When the
application paragraph correctly instructs the jury but the abstract paragraph
is erroneous, any error contained in the abstract instruction is not
egregious.  Medina v. State, 7
S.W.3d 633, 640 (Tex. Crim. App. 1999), cert. denied, 529 U.S. 1102
(2000); Fulcher v. State, 274 S.W.3d 713, 717 (Tex. App.CSan
Antonio 2008, pet. ref=d).  However, when, as in this case, the jury
charge contains all the required mens rea in the abstract and definition
paragraphs, but fails to include an explicit mens rea in the application
paragraph, we must consider whether jury charge error caused egregious harm
because Athe
crucial part of the charge in determining the existence of fundamental error is
that part where the law is applied to the facts.@  Fulcher, 274 S.W.3d at 717; Hanks
v. State, 625 S.W.2d 433, 435 (Tex. App.CHouston
[14th Dist.] 1981, no pet.).








Egregious
harm is the type and level of harm that affects the very basis of the case,
deprives the defendant of a valuable right, or vitally affects a defensive
theory.  Allen v. State, 253
S.W.3d 260, 264 & n.15 (Tex. Crim. App. 2008); Olivas v. State, 202
S.W.3d 137, 144, 149 (Tex. Crim. App. 2006); Almanza v. State, 686
S.W.2d 157, 172 (Tex. Crim. App. 1985) (op. on reh=g).  In making an egregious harm determination, Athe
actual degree of harm must be assayed in light of the entire jury charge, the
state of the evidence, including the contested issues and weight of probative
evidence, the argument of counsel and any other relevant information revealed
by the record of the trial as a whole.@  Almanza, 686 S.W.2d at 171; see
generally Hutch v. State, 922 S.W.2d 166, 172B74 (Tex.
Crim. App. 1996).  The purpose of this
review is to illuminate the actual, not just theoretical, harm to the accused. Almanza,
686 S.W.2d at 174.  Egregious harm is a
difficult standard to prove and must be determined on a case-by-case
basis.  Ellison v. State, 86
S.W.3d 226, 227 (Tex. Crim. App. 2002); Hutch, 922 S.W.2d at 171.

Analysis

Although
the abstract part of the charge contained the culpable mental state and
definitions of intentional and knowing, the culpable mental state was omitted
in the application paragraph, which read:








Now, if you find from the evidence beyond a
reasonable doubt that on or about the 22nd day of February, 2006, in Denton
County, Texas, the defendant, JOHN YOUNG, did then and there with intent to
facilitate his flight after the attempt or commission of a felony, to-wit:
Robbery, abduct Sharice Brodie by restricting the movements of Sharice Brodie
without her consent so as to interfere substantially with her liberty, by
moving her from one place to another by threatening to use deadly force, then
you will find the defendant guilty of Aggravated Kidnapping as alleged in Count
II of the indictment.[14]

 

But the application paragraph
immediately followed the abstract paragraph that included the culpable mental
state, along with the correct definitions. 
Thus, viewing the charge as a whole, the abstract portion sufficiently
informed the jury of the mental state required for commission of the charged
offense.  See Dinkins v. State,
894 S.W.2d 330, 339 (Tex. Crim. App.), cert. denied, 516 U.S. 832
(1995); Fulcher, 274 S.W.3d at 718; Lane v. State, 957 S.W.2d
584, 587 (Tex. App.CDallas 1997, pet. ref=d).








Additionally,
the majority of the testimony at trial, and the jury argument, focused on
whether appellant was the person who committed the robbery and was driving the
Suburban, an issue not contested on appeal; appellant=s main
defensive theory was that the owner of the Suburban could have been the
perpetrator.  In addressing the proof of
abduction, the State argued that appellant shoved the gun under the towel and
said, AGet in
the car, Go,@ while approaching Carlton and
that those actions amounted to a threat of force. Appellant argued to the jury
that there was no evidence he was holding a gun, only that Carlton and Sharice
perceived he was doing so; therefore, he could not have threatened deadly
force.  None of the evidence pointed to a
different mental state regarding the alleged restraint of Carlton=s and
Sharice=s
liberty, especially considering the State=s
emphasis that appellant=s actions toward them were made
with the specific intent to facilitate his flight from the robbery.  Accordingly, we conclude and hold that
appellant did not suffer egregious harm as a result of this error in the
application paragraph of the charge.








Appellant
also complains, without citation to authority, that the trial court erroneously
substituted Aliberty@ for Aliberation@ in the
definition of Aabduct@ in the
application paragraph, causing egregious harm. 
However, the court correctly defined Aabduct@ in the
abstract part of the charge, which read:  A>Abduct= means
to restrain a person with intent to prevent his or her liberation by
using or threatening to use deadly force.@  [Emphasis added.]  See Tex. Penal Code Ann. '
20.01(2)(B); Laster v. State, 275 S.W.3d 512, 521 (Tex. Crim. App.
2009).  Additionally, although appellant
contends that this switch of words Alowered
the burden of proof because many things could interfere generally with one[>]s
liberty but not with one[>]s liberation,@ the
usage here implies essentially the same thing: 
Aliberty@ is
defined as freedom from physical restraint, and Aliberation@ is
defined as the act of setting free or the state of being set free.  Merriam Webster=s
Collegiate Dictionary 670 (10th ed. 1996). Accordingly, we conclude and hold
that appellant did not suffer egregious harm from this minor error in the
definition of abduct in the application part of the charge.  We overrule appellant=s fifth
through seventh points.

Lesser-Included Offense

In his
ninth point, appellant contends that the trial court erred by failing to
include an instruction on unlawful restraint in the charge.  At the charge conference, both attorneys
stated that they had read the charge and had no objections.  The trial court need not submit a lesser
included instruction sua sponte if neither side requests one.  Delgado v. State, 235 S.W.3d 244, 249B50 (Tex.
Crim. App. 2007); Mashburn v. State, 272 S.W.3d 1, 15 (Tex. App.CFort
Worth 2008, pet. ref=d).  Moreover, the defense may not claim error
successfully on appeal due to the omission of a lesser included offense if the
defense did not request one.  Delgado,
235 S.W.3d at 250; Mashburn, 272 S.W.3d at 15.  Accordingly, we overrule appellant=s ninth
point.








Safe Release Instruction

In his
first and second points, appellant contends that the charge at punishment
should have included an instruction on safe release and that trial counsel was
ineffective for failing to request such an instruction.

Aggravated
kidnapping is a first degree felony unless a defendant proves at punishment
that he or she voluntarily released the victim in a safe place, in which case
it is a second degree felony.  See
Tex. Penal Code Ann. ' 20.04(c)B(d).  Because appellant did not request such an
instruction, the trial court did not err by failing to include one sua sponte.  See id.; Posey v. State, 966
S.W.2d 57, 63 (Tex. Crim. App. 1998); Hernandez v. State, 10 S.W.3d 812,
821 (Tex. App.CBeaumont 2000, pet. ref=d).  We overrule appellant=s first
point.








Appellant
also claims that his counsel was ineffective for failing to request a safe
release instruction.  However, appellant
cannot show that but for this failure, the outcome would have been different.  See Strickland v. Washington,
466 U.S. 668, 687, 104 S. Ct. 2052, 2064 (1984); Hernandez v. State, 988
S.W.2d 770, 770 (Tex. Crim. App. 1999). 
Here, the jury found both of the enhancement paragraphs true.  Because the enhanced punishment range is the
same for a second degree felony enhanced by two prior felony convictions as it
is for a first degree felony enhanced by two prior felony convictions,
appellant would have been subject to the same punishment range even if his
counsel had requested a safe release instruction and proved the defense to the
jury by a preponderance of the evidence. 
See Tex. Penal Code Ann. ' 12.42(d)
(Vernon Supp. 2009); Milner v. State, 263 S.W.3d 146, 148 (Tex. App.CHouston
[1st Dist.] 2006, no pet.).  We overrule
appellant=s second point.

Order of Enhancement Offenses

In his
third and fourth points, appellant contends that the trial court erred by
failing to instruct the jury that it must find that the second alleged
enhancement offense was committed after the first alleged enhancement offense
and that the trial court erred by improperly commenting on the evidence in the
jury charge as a result of erroneously instructing the jury to find the second
alleged enhancement paragraph true without first finding that it was committed
after the first alleged enhancement offense became final.








For a
conviction to be enhanced under penal code section 12.42(d), A[t]he
[chronological] sequence of events must be proved as follows:  (1) the first conviction becomes final; (2)
the offense leading to a later conviction is committed; (3) the later
conviction becomes final; (4) the offense for which defendant presently stands
accused is committed.@ 
Tex. Penal Code Ann. ' 12.42(d);
Jordan v. State, 256 S.W.3d 286, 290B91 (Tex.
Crim. App. 2008) (quoting Tomlin v. State, 722 S.W.2d 702, 705 (Tex.
Crim. App. 1987)). 

The
charge at punishment instructed the jury as follows:

If you find from the evidence beyond a reasonable doubt, that prior to
the commission of the offense of which you have just found the defendant
guilty, that the defendant was convicted in cause number 406751D on or about
the 13th day of June, 1991, in the Criminal District Court of Tarrant County,
Texas, for the felony offense of Forgery, and that such conviction, if any,
occurred and the judgment thereon became final prior to the commission of the
offense for which you have found the defendant guilty, you will find that the
allegation in the first enhancement paragraph is Atrue.@  If you do not so believe, or if you have a
reasonable doubt thereof, you will so state by signing the appropriate verdict
form under the instructions herein given to you.

 

If you find from the evidence beyond a reasonable doubt, that prior to
the commission of the offense of which you have just found the defendant
guilty, that the defendant was convicted in cause number F-9345014-UJ on or
about the 10th day of December, 1993, in the Criminal District Court of Dallas
County, Texas, for the felony offense of Aggravated Robbery, and that such
conviction, if any, occurred and the judgment thereon became final prior to the
commission of the offense for which you have found the defendant guilty, you
will find that the allegation in the second enhancement paragraph is Atrue.@  If you do not so believe, or if you have a
reasonable doubt thereof, you will so state by signing the appropriate verdict
form under the instructions herein given you.

 








In the event you have found that both the first enhancement paragraph
and the second enhancement paragraph is true beyond a reasonable doubt, you
will assess the punishment of the defendant at confinement in the Institutional
Division of the Texas Department of Criminal Justice for any term of years not
less than twenty-five (25) years nor more than ninety-nine (99) years, or
life. . . .

 

The part of the verdict form signed by the jury foreperson read as
follows:

 

We, the jury, having found the defendant, JOHN
YOUNG, guilty of the offense of Aggravated Kidnapping, as alleged in Count I of
the indictment, further find that the allegations contained in both enhancement
paragraphs of the indictment herein as ATrue@, and that the defendant is the same person who,
prior to the commission of said offense of Aggravated Kidnapping, Count I, had
been convicted of the offense of Forgery in cause number 406751D in Tarrant
County, Texas on the 13th day of June, 1991, and we further find that prior to
the commission of that offense of Forgery the defendant had been convicted of
the felony offense of Aggravated Robbery in cause number F-9345014-UJ in Dallas
County, Texas on the 10th day of December, 1993, and we assess his punishment
at confinement in the Institutional Division of the Texas Department of
Criminal Justice for a term of 55 YEARS. 
(Insert a term of not less than twenty-five (25) years nor more than
ninety-nine (99) years, OR insert the word ALife@) . . . .

 








The
State concedes that the charge erroneously instructed the jury to assess
punishment in the range of twenty-five to ninety-nine years or life if it found
the 1993 Dallas County conviction occurred Aprior to@ instead
of after the 1991 Tarrant County conviction. 
Because appellant stated affirmatively that he had no objection to the
charge, we review harm under the Almanza egregious harm standard.  See Tex. Code Crim. Proc. Ann. art.
36.14 (Vernon 2007); Bluitt v. State, 137 S.W.3d 51, 53 (Tex. Crim. App.
2004); Almanza, 686 S.W.2d at 171B72; cf.
Jordan, 256 S.W.3d at 292 (refusing to apply harm analysis when State
did not sufficiently prove enhancement allegations because Arather
than ensuing from action or inaction on the part of the trial judge,
[evidentiary insufficiency] resulted from the jury's unsupported determination
that the State=s evidence supported a finding
of true to the second enhancement allegation@).








The
State introduced pen packets for the 1991 and 1993 offenses, showing that
appellant was sentenced in Tarrant County on June 13, 1991, that he committed
the Dallas County offense on October 12, 1993, and that he was sentenced in the
Dallas County offense on December 10, 1993. Appellant did not challenge the
finality of the offenses; instead, he argued that the State did not
sufficiently prove that the fingerprints on the pen packets were his
fingerprints.  See Fletcher
v. State, 214 S.W.3d 5, 8 (Tex. Crim. App. 2007) (AOnce the
State provides prima facie evidence of an enhancement conviction, >this
Court will presume that a conviction is final when faced with a silent record
regarding such.=@).  Accordingly,
the evidence presented by the State sufficiently proved the
statutorily-prescribed order of the enhancement offenses.  And, although we do not presume to divine the
processes of the jury=s deliberations, the error in
the charge seems to be obvious, as a 1991 conviction would have clearly
occurred before a 1993 conviction. 
Accordingly, we conclude and hold that appellant was not egregiously
harmed by the error.  See Rice v.
State, 746 S.W.2d 356, 360B61 (Tex.
App.CFort
Worth 1988, pet. ref=d).  We overrule his third and fourth points.

Conclusion

Having
overruled all of appellant=s
points, we affirm the trial court=s
judgment.

 

 

TERRIE LIVINGSTON

JUSTICE

 

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

DO NOT PUBLISH

See Tex. R.
App. P. 47.2

DELIVERED:  December 17, 2009











[1]See Tex. R. App. P. 47.4.





[2]The wreck occurred near
the intersection of I-35 and the George Bush tollway in Carrollton.





[3]It appears from Carlton=s testimony that
appellant said this twice, but it is unclear in exactly what sequence appellant
told Carlton to get back in the car. 
However, Carlton=s testimony makes it
clear that he felt he had no choice but to get back in the car because he
thought appellant was threatening him with a gun.





[4]Carlton had the
impression that appellant did not have a particular destination in mind but
rather just wanted to be away from the scene.





[5]Sharice confirmed that
she had awakened him right before the cars collided.





[6]When asked if Carlton
told her when he got in the car, ADrive, let=s go to La Quinta,@ Sharice said yes.





[7]In contrast, Carlton had
testified that because the La Quinta was right off the main road, Aif anything would have
happened right there, . . . everybody would see.@





[8]Detective Fernandez
actually called the cell phone number that had been given to him by the
detective investigating the Sonic robbery, and the recovered cell phone rang.





[9]The Sonic is located in
Dallas County.





[10]The lineup, which was
admitted into evidence, consists of six driver=s license photographs,
each around two inches by two inches. 
Detective Feagins testified that he had developed appellant as a suspect
in two other incidents about two weeks earlier, which is why he had the photo
array with him.





[11]According to Detective
Feagins, they identified the photo of appellant simultaneously; he did not
separate them for purposes of identifying their assailant.





[12]Sanders apparently told
Detective Feagins that he had been working.





[13]Sanders=s place of employment was
about three miles from where the wreck occurred and about eight or nine miles
from the Sonic.





[14]The charge was the same
as to the allegation involving Carlton.