TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-06-00454-CR






Suzanne Kearns Dewalt, Appellant


v.


The State of Texas, Appellee






FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT

NO. CR2006-132, HONORABLE GARY L. STEEL, JUDGE PRESIDING





O P I N I O N


 After a Comal County jury awarded sole managing conservatorship of her five year-old son to his father--her ex-husband--rather than her, appellant Suzanne Kearns Dewalt fled
with the child to Mexico. Almost three years later, Dewalt was apprehended in that country and
returned with the child to Comal County. She was subsequently indicted for the offense of
aggravated kidnapping. Another Comal County jury found her guilty and assessed punishment
at five years' imprisonment and a $10,000 fine. In four issues on appeal, Dewalt argues that the
district court abused its discretion in excluding evidence to the effect that she acted as a "protective
mother" in fleeing the jurisdiction based on her belief that her ex-husband would harm the child. 
Dewalt also complains that the district court abused its discretion in limiting her voir dire, that she
is entitled to an instructed verdict because proof of the elements used to aggravate her kidnapping
charge "were subsumed within the proof of the underlying offense," and that the State failed to meet
its burden of proving venue in Comal County. We will affirm the judgment of conviction.


BACKGROUND

 Dewalt married Michael Craig Dewalt, then a U.S. Navy officer, in 1995. On
October 1, 1997, the couple's only child, a son, J.M.D., was born. At the time, the family lived in
Japan, where Michael, (1) on his first overseas tour following his graduation from the Naval Academy
and earning his "wings," was deployed on an aircraft carrier out of the Atsugi naval base. 
Subsequently, claiming that pollution was causing J.M.D. health problems, Dewalt moved with
the child to San Antonio, where her parents lived. According to Michael, the couple experienced
marital difficulties that ultimately prompted him to obtain reassignment to Corpus Christi, Texas,
where he could rejoin his family. The couple's domestic strife continued nonetheless, and Michael
filed for divorce in April 1999. The final divorce decree, signed later that year, named Dewalt
and Michael joint managing conservators, with Dewalt having the right to determine J.M.D.'s
primary residence. (2)

 In March 2002, Dewalt filed a petition in Comal County district court to terminate
Michael's parental rights to J.M.D. (3) Michael counter-claimed for sole managing conservatorship. 
The custody suit went to trial before the Hon. Jack Robison beginning on Monday, October 14, 2002. 
After two weeks of trial, the district court submitted the case to the jury during the afternoon
of Friday, October 25. The charge inquired as to (1) whether Michael's parental rights to J.M.D.
should be terminated, and if not, (2) whether the existing joint managing conservatorship should
be replaced with a sole managing conservatorship, and if so, (3) whether Michael should be named
sole managing conservator. (4) At approximately 9:40 p.m., the district court, in Dewalt's presence, 
received the jury's verdict. The jury found that Michael's parental rights should not be terminated,
that the existing joint managing conservatorship should be replaced with a sole managing
conservatorship, and that Michael should be J.M.D.'s sole managing conservator. The evidence was
undisputed that the district court, in Dewalt's presence, proceeded to accept the jury's verdict and
ordered that Michael was appointed sole managing conservator of J.M.D. A final written judgment
was later signed in December 2002. 

 It is undisputed that after the jury rendered its verdict and Judge Robison ordered that
Michael would have sole custody of J.M.D., Dewalt did not comply with or seek appellate remedies
from the ruling, but instead fled to Mexico with the child. She remained a fugitive with J.M.D.
until September 2005, when she was apprehended in Zacatecas and returned with the child to
Comal County. Dewalt was indicted for kidnapping, interference with child custody, and hindering
apprehension. These indictments were subsequently dismissed and Dewalt was re-indicted for
aggravated kidnapping, a first-degree felony. See Tex. Penal Code Ann. § 20.04 (West 2003). The
aggravated kidnapping indictment contained two alternative paragraphs, each of which alleged
that Dewalt had committed the elements of kidnapping, but with a different aggravating element. 
Specifically, both paragraphs alleged that on or about October 25 (the last day of her custody trial),
Dewalt (1) "intentionally or knowingly" (2) abducted J.M.D. by (a) restraining him "so as to interfere
substantially with his liberty, by moving him from one place to another," and he was a child of less
than 14 years of age whose "parent and sole managing conservator," Michael Dewalt, or guardian
ad litem, "had not acquiesced in the movement of the child," (b) "with intent to prevent his liberation
by secreting and holding [J.M.D.] in a place where he was not likely to be found." (5) The first of the
two paragraphs, Paragraph A, further alleged that Dewalt had "committed such acts with the intent
to facilitate the commission of a felony, to wit: inference with child custody." (6) See id. § 20.04(a)(3). 
The second, Paragraph B, alleged that Dewalt had "committed such acts with the intent to interfere
with the performance of a governmental function, to wit: a Comal County District Court Jury Trial,
the Jury's Verdict and/or the interim orders of the District Court Judge." See id. § 20.04(a)(6).

 Trial proceeded on the aggravated kidnapping charge. (7) During the guilt-innocence
phase, the State presented evidence that Dewalt had planned, even before her child-custody trial
began, to flee the country with J.M.D. in the event of an adverse outcome. A former neighbor of
Dewalt and J.M.D. in New Braunfels, Kelly Veidt, testified that on October 3, Dewalt told her that
if she was not granted custody of J.M.D., she would leave the country with the child, possibly going
to Japan, because she had previously lived there, and that Dewalt anticipated being able to make a
living by teaching English. Veidt further recounted that when discussing Dewalt's possibly leaving
the country, Dewalt, who was a writer and editor by trade, indicated, "When this is all over I'm going
to write a book about a mother who has to take her child because she didn't get custody or because
custody was granted to the wrong person."

 Later that month, on or about October 8, Dewalt met in New Braunfels with
Jose Uribe, a Mexico City native and U.S. legal resident who operated a New Braunfels business that
imported products from Mexico. Uribe had previously hired Dewalt to prepare marketing materials
for his company. Dewalt, according to Uribe, had approached him for advice regarding travel to
Mexico and living in that country. By the time of their meeting, according to Uribe, Dewalt had
already decided that "if she lost the trial she would go to Mexico" and stated, "I definitely think
we're going to need to go to Mexico." He added that Dewalt divulged that she had consulted with
her child-custody trial attorney regarding her planned disappearance to Mexico and that she
anticipated staying in touch with him until "eventually it was going to work out and that she could
come back when she knew it was okay to come back." (8)

 Among the topics the pair discussed, Uribe further testified, were the resources that
Dewalt would need in Mexico. Dewalt, according to Uribe, indicated that she had between $6-7,000
set aside for use on the trip. (9) She also asked for Uribe's assistance in driving her to the border when
the time came. Uribe agreed to help her, and gave her his cell phone number.

 The State also presented evidence that, as the end of the custody trial
approached, Dewalt, with the assistance of her parents, Ed and Margaret (Peggy) Kearns, concealed
J.M.D.'s whereabouts from the district court. The Kearnses lived in San Antonio in a house
located approximately 25 miles from the Comal County courthouse. Although J.M.D. had
previously remained in New Braunfels while his mother was in trial, Peggy brought him to
San Antonio sometime on Thursday, October 24. During the following day, Friday, October 25,
Peggy took J.M.D. to the San Antonio home of a close friend, Maxine Vaughn. (10) Ms. Vaughn
testified that Peggy called her during the day asking to come over with J.M.D. (11) According to
Vaughn, Peggy and J.M.D. arrived around noon. Vaughn added that Peggy had seemed upset but
indicated to Vaughn, "I don't want to talk about it and get you involved in any of it." There was also
evidence that Peggy brought along packed suitcases and personal belongings.

 Later that evening--witnesses placed the time range at between approximately
8:30 and 8:50 p.m.--the jury indicated to the bailiff that it had reached a verdict. At some point
during deliberations or before he called the jury in to receive the verdict, Judge Robison, according
to several witnesses, inquired of Dewalt where J.M.D. was located. Dewalt, these witnesses
recounted, responded that the child was at her mother's house in San Antonio and provided the
Kearnses' address. This exchange would have occurred when, according to Ms. Vaughn, J.M.D. and
Peggy were instead at her house, not the Kearnses' house. There was also testimony that at some
point before the jury rendered its verdict, Judge Robison ordered Dewalt and her attorney to have
J.M.D. brought to the courtroom and that they assured him the child was on his way.

 Judge Robison also prepared a written order directing a sheriff's deputy who had been
working courthouse security, Dana Myers; J.M.D.'s guardian ad litem, Michael D. Bowles; or "an
employee of Child Protective Services" to immediately transport J.M.D. to the courtroom. There
was no evidence, however, that Dewalt was made aware of this particular order. Based on Dewalt's
prior representations that the child was at the Kearnses' house, Deputy Myers, with the order in hand,
proceeded to that location, accompanied by her husband (who happened to be the police chief of
Garden Ridge) and J.M.D.'s CPS caseworker. After being advised that Deputy Myers had arrived
at the Kearnses' house, Judge Robison called in the jury, accepted the verdict, and ordered from
the bench that Michael would have sole managing conservatorship of J.M.D. That event, it is
undisputed, occurred at approximately 9:40 p.m.

 Meanwhile, at the Kearnses' residence in San Antonio, no one was answering when
Myers's group knocked on the door and rang the doorbell. Judge Robison was so advised, and he
again asked Dewalt, who was still present in the courtroom, where J.M.D. was. According to the
guardian ad litem, Michael Bowles, Dewalt responded, "with my mother." When pressed by
Judge Robison, "Well, where are they?," Dewalt, recounted Bowles, "began to recite the Kearnses'
street address and became emotional and never quite finished."

 During the ensuing minutes, however, Dewalt, accompanied by Ed Kearns, was
able to walk out through the back of the courtroom, into a hallway, and onto an elevator. Shortly
thereafter, Judge Robison ordered sheriff's deputies who were working courthouse security to find
her. They searched the courthouse and surrounding area, but determined that Dewalt and Ed Kearns
had already left the building and driven away.

 The State presented evidence that as these events were occurring at the courthouse,
Dewalt, her parents, and Uribe were coordinating in transporting J.M.D. to Mexico. Jose Uribe
testified that he received a call on his cell phone from Peggy Kearns; there was also evidence
that Dewalt called him. Uribe's cell phone records were in evidence. They reflected incoming calls
at 8:49 and 9:03 p.m., which correspond roughly to the time at which the jury had indicated that it
had reached a verdict. Peggy, according to Uribe, advised him that "they might have to go to
Mexico," further indicating that she was at the home of a friend named Maxine. Uribe proceeded
from his home in Comal County in his minivan, arriving at Ms. Vaughn's house shortly after 9:50. 
Uribe testified that while he was at that location, Peggy received a call from Dewalt. Uribe testified
that he insisted on speaking with Dewalt, hoping to discourage her from fleeing to Mexico, but she
responded "she was going anyway" and asked him to drive J.M.D. and Peggy to Laredo. Although
Uribe initially refused to drive them to Laredo, he agreed to go as far as Pearsall and meet Dewalt
there. (12) Uribe added that packed suitcases had been placed in Maxine's garage and that he assisted
in loading them into his minivan.

 From there, with J.M.D. and Peggy in his minivan, Uribe testified that he drove
south on I-35 to Pearsall, where his group rendezvoused with Dewalt and Ed Kearns, who arrived
in the same vehicle. At this point, according to Uribe, he agreed to continue toward the border with
Dewalt and J.M.D. riding with him and the Kearnses in the other vehicle. Upon reaching Laredo,
Ed, according to Uribe, declined to proceed further. Uribe admitted that he continued in his minivan,
leading the other vehicle across the border and then to a hotel. Uribe then returned to the U.S.,
picked up Ed in Laredo, and proceeded back toward Comal County, dropping off Ed along the way
at his San Antonio home. 

 The State presented additional evidence of Dewalt's planning prior to her flight that
was later recovered from her New Braunfels home, including a handwritten to-do list and
instructions for deleting a computer hard drive. Also, when apprehended in 2005, Dewalt had in her
possession a Texas driver's license belonging to her sister, with indicia that she had used it in
disguising her identity while in Mexico, as well as business cards indicating that--consistent with
her statements to Kelly Veidt in early October 2002--Dewalt had earned some income in Mexico
by teaching English. (13) The State also presented evidence--including email correspondence
between Dewalt and friends in the U.S., including Uribe--reflecting that Dewalt continually took
precautions to avoid discovery and capture in Mexico, including adopting pseudonyms for both
herself and J.M.D., (14) moving as many as nine times, and taking evasive action when encountering
law enforcement. (15)

 Finally, Michael testified that he had not consented to the movement of J.M.D. by
Dewalt and her accomplices after Judge Robison had ordered that he would have sole custody of
J.M.D. On the other hand, it was undisputed that until that time, Dewalt continued to possess the
right under her divorce decree with Michael to determine J.M.D.'s residence. Additionally, Bowles,
J.M.D.'s guardian ad litem, acknowledged that Dewalt was within her rights to take J.M.D. to visit
his grandparent's house in San Antonio, although he indicated that Judge Robison had entered an
order preventing her from changing J.M.D.'s permanent residence from Comal County. He also
admitted that the custody trial jury had been discharged before Dewalt fled to Mexico and that her
flight did not interfere with the presentation of witnesses at trial or the jury's physical acts of
deliberating or rendering its verdict.

 In her defense, Dewalt conceded that she had fled to Mexico with J.M.D., but
attempted to present evidence to the effect that she had acted as a "protective mother." In her
unsuccessful suit to terminate Michael's parental rights, Dewalt had alleged that Michael and
two adult cousins had repeatedly physically and sexually abused J.M.D. during a June 2001 visitation
period, including engaging in "oral sexual activity," "sexual fondling," and "defecation and urination
upon the child." Anticipating that Dewalt would attempt to interject similar allegations into her
criminal trial, the State filed a pretrial motion in limine. At the time, Dewalt was still charged
under the original indictments and had not yet been re-indicted for aggravated kidnapping. The
motion requested the district court to prohibit Dewalt, her counsel and witnesses from referencing
matters including "[a]ny matters touching upon defenses to prosecution pursuant to Chapter 8 of the
Texas Penal Code," "[a]ny matters touching upon justification excluding criminal responsibility
pursuant to Chapter 9 of the Texas Penal Code," and "[a]ny matters suggesting or alluding to any
physical, emotional or sexual abuse of [J.M.D.]" until authorized by the district court. The State
urged specifically that the district court exclude any testimony or references going to a "defensive
theory of necessity," see Tex. Penal Code Ann. § 9.22 (West 2003), unless and until Dewalt could
make a showing, outside of the jury's presence, that she could present legally sufficient evidence
to raise each element of the defense. See Tex. R. Evid. 104. Unless Dewalt could raise a necessity
defense, the State argued, any evidence regarding alleged abuse of J.M.D. would be irrelevant and
extremely prejudicial.

 The district court granted the State's motion in limine but afforded Dewalt the
opportunity to demonstrate, in a rule 104 hearing outside the jury's presence before voir dire, that
she could present evidence legally sufficient to raise a necessity defense such that evidence probative
of that defense would be relevant; otherwise, trial was to proceed under the order in limine. Dewalt
availed herself of that opportunity. For purposes of the hearing, the State conceded two of the
three elements of a necessity defense--the "desirability and urgency of avoiding the harm clearly
outweigh[ed], according to ordinary standards of reasonableness, the harm sought to be prevented
by the law proscribing the conduct"; and that a legislative purpose to exclude the justification
claimed for the conduct did not otherwise plainly appear. See id. § 9.22(2)-(3). The district court
also did not require Dewalt to admit to the charges, see Shaw v. State, 243 S.W.3d 647, 659
(Tex. Crim. App. 2007), cert. denied, 128 S. Ct. 2486 (2008), but focused the hearing solely
on whether Dewalt could make a prima facie showing that she had "reasonably believed"
her conduct was "immediately necessary to avoid imminent harm" to J.M.D. See Tex. Penal Code
Ann. § 9.22(1).

 Dewalt proffered evidence--including her own account and testimony and records
of various health care providers, counselors, and law enforcement and social services personnel who
saw J.M.D. in 2001--that J.M.D. had manifested physical and behavioral phenomena purportedly
indicative of trauma or sexual abuse after returning from his June 2001 visitation with Michael; (16)
that J.M.D. thereafter made outcries alleging abuse and implicating Michael and his cousins; that
J.M.D. had also claimed that Michael and various of his family members (17) had known of the abuse
and threatened J.M.D. with guns, swords, or the prospect of never seeing his mother again if he
disclosed it; and that Dewalt also knew that some of the professionals who saw the child in 2001 had
contemporaneously considered his accounts to be credible and suspected that he had in fact been
abused. With this, Dewalt proffered evidence that some of these providers and counselors had
recommended, at least at the time, that J.M.D. have no contact with his father and that Michael had
been barred by court or military order from having unsupervised visitation with J.M.D. through
the end of the custody trial. Dewalt contended that this evidence was legally sufficient to prove that
she had "reasonably believed" that fleeing the jurisdiction with J.M.D. was "immediately necessary"
to avoid "imminent harm" that Michael would inflict upon the child once he obtained unsupervised
custody. The district court disagreed, and ruled that its order in limine concerning evidence
probative of a necessity defense would remain in place unless there was "new and different evidence
convincing the Court of its relevance." After the original indictments were dismissed and Dewalt
was re-indicted for aggravated kidnapping, this and other pretrial rulings were carried over by
agreement into the new cause.

 During the State's case at trial, Dewalt made several proffers of cross-examination
testimony out of the jury's presence. This included testimony from Maxine Vaughn and Jose Uribe
that Dewalt had contemporaneously expressed the belief that Michael had sexually abused J.M.D.,
testimony from Uribe that Dewalt "said she wasn't going to give [J.M.D.] to a sexual predator" and
claimed that counselors had agreed with her that abuse had occurred, and testimony from the
investigator who apprehended Dewalt in Mexico that she had asked him, "Wouldn't you have
done what I did?" (18) In contrast to her arguments during pretrial hearings, in which she had asserted
the evidence was relevant to a necessity defense, Dewalt shifted focus to argue that the evidence
was relevant to her "intent" or "motive" to "protect her child," reasoning that her intervening
indictment for aggravated kidnapping had placed those matters in issue and rendered necessity
"a secondary defense." In Dewalt's view, she was entitled to present this evidence to "rebut" the
State's allegations and evidence that she had acted with specific intent to either facilitate commission
of interference with child custody or interfere with a governmental function.

 The district court disagreed and excluded this evidence. It distinguished the question
of Dewalt's motive from the issue of her specific intent. The court also cited the evidence's potential
unfairly prejudicial effect on the jury, suggesting that it would amount to a bald plea for jury
nullification, as well as reluctance to consume time and distract the jury by re-trying issues in the
child-custody case that, in the court's view, had little if any relevance to the criminal case. However,
during the State's presentation of Michael, its final witness, the district court ruled that the State
had "opened the door" for Dewalt to elicit some evidence going to her "state of mind" in initiating
the custody suit and her subsequent actions. (19) The court permitted Dewalt to elicit Michael's
acknowledgments that she had sued to terminate his parental rights based on allegations that he
had "physically endangered" J.M.D. during his 2001 summer visitation and that, while Michael
denied the allegations, they were of a nature that would cause a "protective mother" great concern
about her child's physical health and well-being if the child had reported them. However, the
district court continued to exclude any testimony delving into the specific nature or details of the
alleged "physical endangerment." (20)

 After the State rested, Dewalt made a proffer of direct testimony outside the jury's
presence that was generally similar to the evidence she had presented during the pretrial hearing. 
This included records and testimony from health care providers who saw J.M.D. in 2001,
Dewalt's own testimony, and the testimony and investigative report of an F.B.I. agent who
had investigated the abuse allegations. Although ruling that Dewalt's "state of mind" regarding
protection of J.M.D. was "fair game" within the parameters it had previously imposed during
Michael's cross-examination, the district court excluded the proffered evidence from the guilt-innocence phase of trial.


 Following this ruling, Dewalt rested without presenting evidence before the jury.
During charge conference, Dewalt requested an instruction on necessity, which the district court
denied. During closing argument, Dewalt's counsel conceded that "it would be disingenuous and
silly for me to say" that Dewalt had not taken J.M.D. to Mexico, but disputed whether the State had
met its burden to prove beyond a reasonable doubt that she had specifically intended either to
facilitate the offense of interference with child custody or to interfere with a governmental function. 
Counsel argued that the State had presented "no evidence whatsoever . . . of what [Dewalt's] actual
intent was" and urged the jury to infer from the evidence and "common sense" that instead "her
intent was to protect her child." 

 On the seventh day of trial, the district court submitted the question of Dewalt's guilt
or innocence to the jury. After deliberating less than two hours, the jury returned a verdict of guilty. 
The jury then proceeded to hear over seven additional days of evidence on punishment. In contrast
to guilt-innocence, this phase of trial was "wide open," as the district court put it, with respect to
evidence of abuse and the extent to which Dewalt's criminal conduct was driven by her perception
that J.M.D. would be harmed if returned to his father. To counter Dewalt's mitigation theory that
she did the "wrong thing for the right reasons," the State took the position that the abuse had never
occurred, but was a product of Dewalt's manipulation of the child to control, gain custody leverage
against, or punish her ex-husband; suggestiveness by the first counselor who had interviewed J.M.D.;
or simply Dewalt's imagination. (21) If J.M.D. experienced some sort of trauma, the State further
suggested, it was attributable to Dewalt's behavior. (22)

 The charge required the jury to fix punishment at a term of between 5 and 99 years'
incarceration and authorized it to impose a fine not to exceed $10,000. The jury was instructed that
it could recommend probation if it sentenced Dewalt to a sentence of 10 years or less. The jury
imposed punishment at 5 years' incarceration and a $10,000 fine. It did not recommend probation. 
Following a hearing on restitution, the district court rendered judgment on the verdict and ordered
Dewalt to pay a total of $47,480.73 in restitution. This appeal followed.


ANALYSIS

Exclusion of evidence

 In her first issue, Dewalt complains that the district court abused its discretion
during the guilt-innocence phase in excluding evidence "to explain that every decision she made
after the child custody trial was designed to protect her son." She argues both that she proffered
evidence legally sufficient to raise a necessity defense to which the evidence was relevant and that
the excluded evidence was relevant and admissible to "rebut" the State's allegations and evidence
of the aggravating factors of her aggravated kidnapping charge. By preventing her from presenting
this evidence, Dewalt adds, the district court's error infringed her constitutional right to present
a meaningful defense. See Martinez v. State, 212 S.W.3d 411, 423 n.4 (Tex. App.--Austin 2006,
pet. ref'd) ("Persons accused of crimes are guaranteed a meaningful opportunity to present a
complete defense by the Sixth and Fourteenth Amendments to the United States Constitution.")
(citing Crane v. Kentucky, 476 U.S. 683, 690 (1986)). 

 When reviewing a trial court's decision to admit or exclude evidence, we apply
an abuse-of-discretion standard. Ramos v. State, 245 S.W.3d 410, 417-18 (Tex. Crim. App. 2008). 
This includes complaints that the exclusion of evidence infringed the defendant's constitutional right
to a meaningful opportunity to present a defense. See Miller v. State, 36 S.W.3d 503, 507
(Tex. Crim. App. 2001). The trial court does not abuse its discretion unless its ruling lies
"outside the zone of reasonable disagreement." Walters v. State, 247 S.W.3d 204, 217 (Tex. Crim.
App. 2007). 

 We begin with Dewalt's argument regarding her "specific intent," as it relates to
Dewalt's culpability for aggravated kidnapping and thus logically precedes her contentions
regarding justification by necessity. See Shaw, 243 S.W.3d at 659. Dewalt asserts that she was
entitled to present evidence of "circumstances surrounding [J.M.D.'s] allegations . . . and the
resulting need to protect her son, that led her to act" because it was relevant and admissible to
"rebut" the State's allegations and evidence that "she had acted with the intent of interfering with
child custody or a governmental function." We cannot conclude that the district court abused its
discretion in concluding otherwise.

 Under the indictment, as well as the jury charge, the State was required to prove
that Dewalt "intentionally or knowingly" "abducted" J.M.D. (which in itself required the State
to prove that Dewalt "restrained" the child by moving him without the consent of Michael or
his guardian ad litem with the specific intent "to prevent his liberation by secreting and holding
[J.M.D.] in a place where he was not likely to be found") with the further specific intent either
"to facilitate the commission of a felony, to wit: interference with child custody" (which was
defined in the charge in a manner consistent with the penal code (23)) or "to interfere with the
performance of a governmental function, to wit: a Comal County District Court Jury Trial, the
Jury's Verdict and/or the interim orders of the District Court Judge." See Laster v. State,
275 S.W.3d 512, 521 (Tex. Crim. App. 2009). The penal code provides, and the jury was instructed,
that "[a] person acts intentionally, or with intent, with respect to the nature of [her] conduct or to a
result of [her] conduct when it is [her] conscious objective or desire to engage in the conduct or
cause the result." Tex. Penal Code Ann. § 6.03(a) (West 2003). In sum, the State was required to
prove that Dewalt had the conscious objective or desire to interfere with Michael's child custody
rights under Judge Robison's order and/or the judicial proceedings declaring those rights when
restraining J.M.D. with the conscious mental objective or desire to prevent his liberation by secreting
or holding him.

 As the district court suggested, Dewalt confuses a question of her motive--whether
and why she perceived a "need to protect her son" that incited her to take these actions--with one
of the specific intent elements the State had to prove--whether, when so acting, she had the
conscious objective or desire to interfere with Michael's child custody rights and/or the judicial
proceedings declaring those rights. See, e.g., Black's Law Dictionary 810 (6th ed. 1990) ("Intent
and motive should not be confused. Motive is what prompts a person to act, or fail to act. Intent
refers only to a state of mind with which the act is done or committed."). And, contrary to Dewalt's
assertions, proof that she had a motive to protect J.M.D. has little, if any, probative value toward
negating the existence of a conscious objective or desire on her part to interfere with Michael's
child custody rights and/or the judicial proceedings declaring those rights. The two are not mutually
exclusive and, if anything, proof of Dewalt's motive would instead be circumstantial evidence
tending to support the State's allegations that she acted with such a conscious objective or desire. 
Indeed, proof of such a motive would tend to confirm that infringing Michael's custody rights and
countermanding the judicial process was the whole point of Dewalt's actions. 

 Even if proof of Dewalt's motive had some relevance under her theory, the
district court did not abuse its discretion in excluding much of the evidence that Dewalt sought
to present to prove her motive. As previously explained, the district court did not wholly prevent
Dewalt from presenting evidence that she "acted . . . to protect her son," but ultimately ruled that
Dewalt's motive was "fair game" to the extent of evidence that she had alleged Michael had
"physically endangered" J.M.D. in a manner that would cause a "protective mother" great concern
about her child's physical health and well-being. However, the district court did continue to exclude
evidence detailing the nature of the alleged "physical endangerment"--i.e., that the child had been
sexually abused and threatened--graphic accounts of J.M.D.'s alleged outcries and physical or
behavioral phenomena, and testimony or records of health care providers or investigators bolstering
Dewalt's allegations. It is this evidence that is the subject of Dewalt's complaint on appeal.

 "The Constitution leaves to the [trial] judges . . . 'wide latitude' to exclude evidence"
that, among other things, "poses an undue risk of 'harassment, prejudice, [or] confusion of the
issues.'" Crane, 476 U.S. at 689-90 (quoting Delaware v. Van Arsdall, 475 U.S. 673, 679 (1986)). 
Rule of evidence 403 provides that otherwise relevant evidence "may be excluded if its probative
value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or by
considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403. 
In contrast to what is at best limited probative value in controverting the State's allegations of
specific intent, the factors weighing against admission of Dewalt's evidence going to her professed
motive to "protect her son"--especially sensational details of the alleged abuse--were high. 
Evidence of sexual abuse, especially allegations of such abuse perpetrated by a parent on a child,
is extremely prejudicial. See Wheeler v. State, 67 S.W.3d 879, 889 (Tex. Crim. App. 2002); Kirby
v. State, 208 S.W.3d 568, 572-75 (Tex. App.--Austin 2006, no pet.); see also Richardson v. Green,
677 S.W.2d 497, 501 (Tex. 1984) (reversing order terminating father's parental rights after
concluding that trial court erred in admitting inflammatory and "highly prejudicial" hearsay evidence
pertaining to mother's allegations that father sexually abused their child). As the district court aptly
observed during trial, this evidence would have interjected into trial an emotionally charged set of
collateral issues with great potential to confuse and mislead the jury. And once those issues were
placed before the jury, the court also noted, it would be necessary to essentially re-try the issues in
the child-custody case, requiring a week or more of additional testimony (as ultimately borne out in
the trial's punishment phase, in which that evidence was admitted), and further confusing and
distracting the jury from the issues that properly control under the applicable law. The district court
did not abuse its discretion in finding the evidence substantially more prejudicial than probative, and
excluding it on that basis.

 Nor did the district court abuse its discretion in excluding Dewalt's evidence to
the extent offered as proof of a necessity defense. The admissibility of the evidence under that
theory turns on the district court's determinations that Dewalt did not present evidence outside
the jury's presence sufficient to support or "raise" a necessity defense so as to ultimately be entitled
to submission of the defense to the jury. A defense is supported or raised by the evidence "if there
is some evidence, from any source, on each element of the defense that, if believed by the jury,
would support a rational inference that the element is true." See Shaw, 243 S.W.3d at 657-58. "In
determining whether a defense is thus supported, a court must rely on its own judgment, formed in
the light of common sense and experience, as to the limits of rational inference from the facts
proven." Id. at 658. If a defense is supported by the evidence, then the defendant is entitled to an
instruction on that defense, even if the evidence supporting the defense is weak or contradicted,
and even if the trial court is of the opinion that the evidence is not credible." Id. "But the evidence
must be such that it will support a rational jury's finding as to each element of the defense." Id. We
review the evidence in the light most favorable to the defense and determine whether a rational juror
could accept it as sufficient to prove each defensive element. See Stefanoff v. State, 78 S.W.3d 496,
499-500 (Tex. App.--Austin 2002, pet. ref'd). Whether a defense is supported by the evidence is
a sufficiency question reviewable on appeal as a question of law. Shaw, 243 S.W.3d at 658. The necessity defense is codified in chapter 9 of the penal code. Under chapter 9, 
"It is a defense to prosecution that the conduct in question is justified under this chapter." Tex. Penal
Code Ann. § 9.02. Necessity is one justification for conduct under chapter 9. Id. § 9.22. For
conduct to be justified by necessity, section 9.22 requires proof of each of the following elements: 


(1) the actor reasonably believes the conduct is immediately necessary to avoid
imminent harm;


(2) the desirability and urgency of avoiding the harm clearly outweigh, according
to ordinary standards of reasonableness, the harm sought to be prevented by
the law proscribing the conduct; and


(3) a legislative purpose to exclude the justification claimed for the conduct does
not otherwise plainly appear.



Id. In addition to these explicit statutory elements, the Court of Criminal Appeals has held--based
on the text of the penal code and the theory that necessity is a "true" defense that justifies or excuses
otherwise-criminal conduct rather than merely contravening an element of the offense--that a
defendant must present evidence "essentially admit[ting] to every element of the offense including
the culpable mental state" in order to raise a necessity defense. Shaw, 243 S.W.3d at 659. Assuming
without deciding that Dewalt met the other requirements for raising a necessity defense, (24) we
conclude that the district court did not err in determining that, as a matter of law, she failed to present
legally sufficient evidence that she "reasonably believed" kidnapping J.M.D. was "immediately
necessary" to avoid "imminent harm."

 As proof of this element, Dewalt emphasizes proffered evidence to the effect that she
sincerely believed J.M.D. would be immediately harmed if ever left with Michael unsupervised. 
However, even a defendant's sincere belief that his or her conduct is immediately necessary to avoid
imminent harm is unreasonable as a matter of law if the undisputed facts demonstrate a complete
absence of "immediate necessity" or "imminent harm" as those concepts are defined in the law. See
Washington v. State, 152 S.W.3d 209, 212 (Tex. App.--Amarillo 2004, no pet.); Arnwine v. State,
20 S.W.3d 155, 159 (Tex. App.--Texarkana 2000, no pet.). Consequently, "Section 9.22(1) requires
the defendant to first bring forward evidence of a specific imminent harm." Stefanoff, 78 S.W.3d
at 500. "'Imminent' means something that is immediate, something that is going to happen now." 
Id. at 501. Thus, "imminent harm," as this Court has previously explained, "contemplates a reaction
to circumstances that must be the result of a 'split-second decision [made] without time to consider
the law," id. (quoting Smith v. State, 874 S.W.2d 269, 272-73 (Tex. App.--Houston [14th Dist.]
1994, pet. ref'd), "an immediate, non-deliberative action made without hesitation or thought of the
legal consequence." Id. Accord Smith, 874 S.W.2d at 273 ("An 'imminent harm' occurs when there
is an emergency situation, and it is 'immediately necessary' to avoid that harm when a split-second
decision is required without time to consider the law.").

 As proof of "imminent harm," Dewalt cites her proffered evidence that she had reason
to believe J.M.D. had been abused in June 2001, that he had been physically threatened not to
divulge the abuse, and that some professionals who saw J.M.D. in 2001 had contemporaneously
found J.M.D.'s accounts credible and opined (at least at the time) that it would be detrimental to
him to have contact with his father. She adds that Michael had not been permitted unsupervised
visitation with J.M.D. between the time the abuse allegations surfaced through the custody trial. 
This evidence, Dewalt argues, supports a finding that she reasonably believed "some harm [was]
going to befall [J.M.D.] the split second he was turned over to his father in the courtroom," that the
child "would be traumatized by being unsupervised with his father, that he would face immediate
physical and sexual 'punishment' for telling the 'secret,'" and that she "would be helpless to prevent
the harm." To the contrary, undisputed evidence establishes the absence of "imminent harm" as a
matter of law.

 Dewalt asserts that she faced "imminent harm" beginning when the jury rendered
its verdict awarding custody of J.M.D. to Michael. At that moment, it is undisputed that the child
was in San Antonio, a half-hour or more drive from the courthouse in New Braunfels where
his parents were. Whatever threat of harm that Michael could have presented to J.M.D. from
Dewalt's perspective was not "something that [was] going to happen now." Stefanoff, 78 S.W.3d
at 501; see Kenny v. State, 292 S.W.3d 89, 101 (Tex. App.--Houston [14th Dist.] 2007, pet. dism'd)
(no evidence of "immediate necessity" or "imminent harm" where complainant and defendant "had
argued for at least five minutes" before defendant tied complainant's wrists together ostensibly to
prevent her from driving drunk). (25) Moreover, any threat of harm Michael could have presented at
the moment the jury rendered its verdict grew only less "imminent" as Dewalt's abduction of J.M.D.
continued during the hours and miles of Dewalt's flight to the Mexican border--not to mention
during the months and years in which Dewalt remained with the child in Mexico. See Schier
v. State, 60 S.W.3d 340, 343-44 (Tex. App.--Houston [14th Dist.] 2001, no pet.) (in interference
with child custody prosecution of defendant who picked up child for weekend visitation and kept
her for over eight months, evidence that child had previously been abused by mother and that
mother abused drugs and alcohol, while probative of a "deplorable" and potentially harmful
home environment for the child, did not "make[] it any more or less likely that there was an
emergency situation 'on the point of happening,'which required appellant to act immediately");
Smith, 874 S.W.2d at 273 (in interference with child custody prosecution, imminent harm negated
because "appellant had plenty of time to consider his options and the penalties he would receive if he
decided to violate the court's order" when children were in defendant's possession almost 24 hours
before their flight and defendant thereafter had "concealed the location of his children for over
seven years. We cannot hold it was immediately necessary for him to keep them out of the
United States for that long, regardless of what danger they were in before they left"); see also
Sanders v. State, 605 S.W.2d 612, 614 (Tex. Crim. App. 1980) (observing that "[a]bduction . . . is
a continuing offense, "[t]he restraint in abduction does not necessarily 'occur' only at one specific
time," and that "[t]here is no time limit for abduction"). Furthermore, while Dewalt claims that she
did not firmly decide to flee to Mexico with J.M.D. until the jury rendered its verdict, it remains
undisputed that she had anticipated the jury could or would award custody to Michael and began
planning the flight even before the two-week trial began. See Contreras v. State, 73 S.W.3d 314,
318-19 (Tex. App.--Amarillo 2001, no pet.) (no evidence of "imminent harm" where there was
undisputed evidence of prior planning to stab decedent and stabbing occurred over one hour after
decedent allegedly sexually abused defendant).

 In short, these undisputed facts negate, as a matter of law, the sort of "emergency
situation" necessitating a "split-second decision made without time to consider the law" that
distinguishes "imminent harm" and can raise a necessity defense. Instead, the evidence reflects a 
calculated decision by Dewalt--before, during, and continuing for years after her trial--to ignore
and avoid the law. Consequently, the district court did not err in holding that Dewalt could not raise
a necessity defense and did not abuse its discretion in excluding evidence Dewalt sought to present
to prove that defense. 

 Assuming, as we must, that Dewalt sincerely believed Michael would harm J.M.D.
once the child was returned to him, the prospect of complying with the verdict and judgment
awarding custody to Michael would have been agonizing for any parent. However, the fact that
Dewalt might have strongly disagreed with the jury's verdict in her child-custody litigation does not,
in itself, defeat or excuse her criminal responsibility for aggravated kidnapping under Texas law.

 The district court did not abuse its discretion in ensuring that the evidence at trial
remained focused on the issues that were relevant to Dewalt's criminal responsibility under
Texas law. We overrule Dewalt's first issue. 


Voir dire

 In the alternative, in her second issue, Dewalt asserts that the district court abused
its discretion during voir dire by not allowing her to ask questions of the venire related to J.M.D.'s
alleged abuse and her reasons for kidnapping him. Even assuming this evidence was properly
excluded from the guilt-innocence phase of trial, Dewalt argues, she was entitled to inquire into these
matters because the evidence was ultimately admitted during punishment phase. The State responds
that Dewalt failed to preserve error on this issue.

 When an appellant challenges a trial court's limitation of her voir dire, the reviewing
court analyzes this challenge under an abuse-of-discretion standard, "the focus of which is whether
the appellant proffered a proper question concerning a proper area of inquiry." Caldwell v. State,
818 S.W.2d 790, 793 (Tex. Crim. App. 1991), overruled on other grounds, Castillo v. State,
913 S.W.2d 529 (Tex. Crim. App. 1995). The propriety of a particular question is left to a
trial court's discretion, and its ruling will not be disturbed on appeal absent an abuse of discretion. 
Sells v. State, 121 S.W.3d 748, 755 (Tex. Crim. App. 2003). A trial court's discretion is abused
when it prohibits a proper question about a proper area of inquiry. Id. at 755-56. A "proper"
question is one which seeks to discover a veniremember's views on an issue applicable to the case. 
Rhoades v. State, 934 S.W.2d 113, 118 (Tex. Crim. App. 1996). 

 In order to decide whether the trial court abused its discretion in prohibiting a
voir dire question, the reviewing court "must first determine if the appellant proffered a proper
question"--one which is both "appropriately phrased and relevant." Caldwell, 818 S.W.2d at 793,
794. If an appellant does not actually frame a question to the trial court, nothing is preserved
for review. Caldwell, 818 S.W.2d at 794. Similarly, an appellant does not preserve error by
informing the trial court of the general subject area from which she wishes to propound questions. 
Sells, 121 S.W.3d at 756; Caldwell, 818 S.W.2d at 794. "Potentially, a wide range of specific
questions--both proper and improper--could [be] asked within [a proper subject] area." Caldwell,
818 S.W.2d at 794. For this reason, in order to preserve error as to the improper limitation of
voir dire, an appellant "must show that he was prevented from asking particular questions that
were proper." See Sells, 121 S.W.3d at 756 (emphasis in original). "That the trial court generally
disapproved of an area of inquiry from which proper questions could have been formulated is not
enough because the trial court might have allowed the proper question had it been submitted for the
court's consideration." Id.

 In this case, the record does not reflect any specific questions that Dewalt sought to
ask the venire but was prohibited from doing so. Nor does Dewalt refer in her brief to any specific
questions that she was prevented from asking. Because Dewalt did not show that she was prevented
from asking a specific proper question, she failed to preserve error.

 We overrule Dewalt's second issue.


Venue

 In her third issue, Dewalt contends that the State failed to present legally sufficient
evidence of venue in Comal County. "The State need prove venue only by a preponderance of
the evidence." Murphy v. State, 112 S.W.3d 592, 604 (Tex. Crim. App. 2003) (citing Tex. Code
Crim. Proc. Ann. art. 13.17 (West 2005)). Venue may be proven by circumstantial as well as
direct evidence. Stanley v. State, 471 S.W.2d 72, 77 (Tex. Crim. App. 1971); Bollinger v. State,
224 S.W.3d 768, 776 (Tex. App.--Eastland 2007, pet. ref'd). The trier of fact may make reasonable
inferences from the evidence to decide the issue of venue. Bordman v. State, 56 S.W.3d 63, 70
(Tex. App.--Houston [14th Dist.] 2001, pet. ref'd). Venue will stand if the evidence is sufficient
under any one of the venue provisions on which the jury was instructed. Murphy, 112 S.W.3d
at 605. When reviewing whether there is legally sufficient evidence of venue, "we view all
the evidence in the light most favorable to the verdict and then determine whether a rational trier of
fact could have found venue was proper by a preponderance of the evidence." Gabriel v. State,
290 S.W.3d 426, 435 (Tex. App.--Houston [14th Dist.] 2009, no pet.) (citing Hooper v. State,
214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). "Thus, if there is evidence establishing venue by a
preponderance, we are not authorized to reverse the judgment on sufficiency of the evidence
grounds." Id. at 436.

 The district court instructed the jury regarding the following venue provisions:


You are further charged as the law in this case that the 'venue' for the trial of the
offense of Aggravated Kidnapping is in the county in which the offense was
committed, or in any county through, into or out of which the person kidnapped may
have been taken.


If an offense has been committed within the state and it cannot readily be determined
within which county or counties the commission took place, trial may be held in the
county in which the defendant resides, in the county in which she is apprehended, or
in the county to which she is extradited.



The first instruction submitted venue under article 13.12 of the code of criminal procedure. See
Tex. Code Crim. Proc. Ann. art. 13.12 (West 2005) ("Venue for . . . kidnapping is in either the
county in which the offense is committed, or in any county through, into or out of which the person
. . . kidnapped may have been taken"). The second submitted venue under article 13.19. See
Tex. Code Crim. Proc. Ann. art. 13.19 (West 2005) ("If an offense has been committed within
the state and it cannot readily be determined within which county or counties the commission took
place, trial may be held in the county in which the defendant resides, in the county in which she is
apprehended, or in the county to which she is extradited."). Dewalt argues that the State presented
no evidence that the offense was committed in Comal County or that J.M.D. was thereafter taken
through Comal County, and that the evidence conclusively establishes that it was instead committed
in Bexar County--the county where the Kearnses' and Maxine Vaughn's houses are located--or one
of the counties through which J.M.D. was taken between San Antonio and the Mexican border.

 As noted, the jury charge, consistent with the indictment and the penal code,
submitted whether Dewalt (1) "intentionally or knowingly" (2) "abducted" J.M.D. (3) with the
specific intent either "to facilitate the commission of a felony, to wit: interference with child
custody" (which was defined in the charge in a manner consistent with the penal code) or "to
interfere with the performance of a governmental function, to wit: a Comal County District Court
Jury Trial, the Jury's Verdict and/or the interim orders of the District Court Judge." To find
that Dewalt "abducted" J.M.D., the jury was to find two elements: (1) Dewalt "restrain[ed] [J.M.D.]
. . . so as to interfere substantially with his liberty, by moving him from one place to another,
and the said [J.M.D.] was a child younger than 14 years of age whose parent and managing
conservator--namely: Michael Dewalt or whose guardian--namely: Michael D. Bowles had not
acquiesced in the movement of the child"; and (2) Dewalt restrained J.M.D. "with intent to prevent
his liberation by secreting and holding [J.M.D.] in a place where he was not likely to be found." The
charge also defined "abduct" and "restrain" in accordance with the penal code:


"Abduct" means to restrain a person with intent to prevent his liberation by secreting
or holding him in a place where he is not likely to be found.


"Restrain" means to restrict a person's movements without consent, so as to
interfere substantially with his liberty, by moving him from one place to another or
by confining him. Restraint is "without consent" if it is accomplished by any means,
including acquiescence of the victim, if he is a child less than 14 years of age and the
parent, guardian, or person or institution acting in loco parentis has not acquiesced
in the movement or confinement.



See Tex. Penal Code Ann. § 20.01(a)(1), (2). The jury was also instructed regarding the
law of parties. (26)

 Dewalt argues that the evidence conclusively establishes that the offense could not
have occurred in Comal County because the "restraint" of J.M.D. did not begin until Judge Robison
ordered that Michael was appointed sole managing conservator. As noted, the evidence was
undisputed that until Judge Robison ordered that Michael was appointed sole managing conservator,
Dewalt continued to possess the right under the divorce decree to determine J.M.D.'s residency. In
fact, the district court instructed the jury that:


In the final decree of divorce between Michael Dewalt and Suzanne Dewalt,
Suzanne Dewalt had the right to determine the residence of [J.M.D.] and that
right continued until changed by Order of Judge Robison on October 25, 2002,
at 9:40 p.m. At that time, Judge Robison ordered that Michael Dewalt was appointed
sole managing conservator with the right to determine the residence of [J.M.D.] and
that right continues to this date.



At 9:40 p.m. on October 25, Dewalt emphasizes, it is undisputed that J.M.D. was already in
Bexar County, at Maxine Vaughn's house, and that he was not taken through Comal County on his
subsequent path to Mexico. As for J.M.D.'s movement from Comal County to Bexar County prior
to that time, Dewalt argues that because she had the right under the divorce decree to determine
J.M.D.'s residence, she had power to consent to that movement such that J.M.D. was not
"restrained" at that time as a matter of law. See Tex. Penal Code Ann. § 20.01(1).

 In response, the State does not seem to dispute that J.M.D. was not "restrained" until
9:40 p.m. on October 25, when the child was physically in Bexar County, but urges that the evidence
nonetheless enabled the jury to find the aggravated kidnapping offense occurred in Comal County. 
As the State emphasizes, the charge, consistent with the penal code, instructed the jury that J.M.D.'s
"restraint" (i.e., moving him from place to place without the acquiescence of Michael or Bowles,
the guardian ad litem) could be accomplished by "any means." The State urges that its undisputed
evidence that Dewalt, while still in the Comal County courthouse, took action to mislead
Michael, Bowles, and Judge Robison regarding J.M.D.'s whereabouts supported the jury's finding
that Dewalt had committed a "restraint" of the child in Comal County through the means of
deceiving those who had legal custody and right to control the child and consent on his behalf. (27) 
Additionally, the State observes that "abduction" consists of "restraint" (the actus reus) with the
specific intent to prevent liberation by secreting or holding the victim in a place where he is not
likely to be found (the mens rea), and that the offense of kidnapping is legally completed when
the defendant accomplishes a restraint of the victim and, at any time during the restraint, forms
the requisite specific intent. See Laster, 275 S.W.3d at 521; Mason v. State, 905 S.W.2d 570, 575
(Tex. Crim. App. 1995). As the State urges, there was considerable evidence that Dewalt, while
still in Comal County, had formed the specific intent to prevent J.M.D.'s liberation through the
means of secreting and holding where he was unlikely to be found. See Laster, 275 S.W.3d at 521. 
The same is true of Dewalt's specific intent regarding the aggravating elements, the State adds. 

 We agree with the State that the evidence was legally sufficient to support the jury's
finding, by a preponderance of the evidence, that Dewalt's aggravated kidnapping offense occurred
in Comal County, such that venue in that county was proper under article 13.12. In the alternative,
even if the evidence was not sufficient to prove venue in Comal County, on this record we would
not find the error to be reversible.

 Historically, when venue has not been proven as alleged, the conviction has been
reversed and a judgment of acquittal rendered. See Black v. State, 645 S.W.2d 789, 791 (Tex. Crim.
App. 1983) ("When venue is made an issue in the trial court, failure to prove venue in the county of
prosecution constitutes reversible error."). However, in 2005, this Court observed that Black was
decided prior to the adoption of the Texas Rules of Appellate Procedure and its provisions regarding
harmless-error analysis. State v. Blankenship, 170 S.W.3d 676, 682 (Tex. App.--Austin 2005,
pet. ref'd). This Court then held that failure to prove venue was non-constitutional error that should
not result in reversal unless the error affected the defendant's substantial rights. Id. at 683; see also
Schemm v. State, 228 S.W.3d 844, 845 (Tex. App.--Austin 2007, pet. ref'd) ("Reversible error may
result from the failure to prove venue as set forth in the charging instrument.") (emphasis added). 
 On this record, we cannot conclude that venue in Comal County violated Dewalt's
substantial rights. A substantial right is affected when the error had a substantial and injurious effect
or influence in determining the jury's verdict. Blankenship, 170 S.W.3d at 683. The issue of venue
controlled only the geographic location where the case was to be tried; it did not impact the
district court's jurisdiction, nor was it an element of any charge or potential defense in this case. See
Thompson v. State, 244 S.W.3d 357, 365 (Tex. App.--Tyler 2006, pet. dism'd). Any error with
regard to venue did not in itself alter the manner in which the charged offense was submitted to the
jury or the jury's decision-making process. See id.

 Further, venue in Comal County was consistent with the underlying legislative
purposes of the venue statutes. Venue statutes function to ensure that jurors have a natural interest
in the case because it touched their community; to ensure that prosecutions are initiated in counties
that have some factual connection to the case, thus minimizing inconvenience to parties and
witnesses; to aid predictability in judicial caseloads, and to prevent forum-shopping by the State. 
George E. Dix & Robert O. Dawson, Texas Practice: Criminal Practice and Procedure § 2.02
(2001). In this case, the criminal acts in question had a substantial, indeed pervasive, connection
with Comal County. Both Dewalt and J.M.D. resided in Comal County at the time of the custody
trial and subsequent flight to Mexico. Many of the relevant events occurred in Comal County. 
Nearly all of the witnesses resided in Comal County. Finally, and perhaps most significantly, the
judicial orders and processes that Dewalt sought to defeat or avoid were those of a Comal County
District Court. Dewalt has not asserted that she was physically inconvenienced by having the trial
in Comal County. Nor is this a case where the State has forum-shopped by bringing a prosecution
in a venue that has only a tenuous connection to the underlying facts. There is no indication that the
State deliberately sought to taint the process by bringing the prosecution in Comal County, as
opposed to exercising prosecutorial discretion regarding an offense centered on that locality. We
also observe that the legislature has provided a venue provision that, if the jury had been instructed
upon it, clearly would have made venue proper in Comal County. See Tex. Code Crim. Proc. Ann.
art. 13.01 (West 2005) (providing that offenses committed "wholly or in part outside this State"
"may be prosecuted . . . in any county in which an element of the offense occurs").

 While Dewalt was critical at trial of the State's exercise of prosecutorial discretion,
she does not assert that she received an unfair trial by virtue of the Comal County venue or that the
jury and judge were anything but impartial. See Tex. Code Crim. Proc. Ann. art. 31.03 (West 2006)
(providing for change of venue in cases where defendant could not receive fair trial). Finally, we
observe there was overwhelming evidence of Dewalt's guilt for aggravated kidnapping. 

 We overrule Dewalt's third issue.





Intent to facilitate interference with child custody as an aggravating factor

 In her fourth issue, Dewalt asserts that "lesser-included offenses cannot serve as
aggravating factors," that the offense of interference with child custody is a lesser-included offense
of kidnapping, and that for these reasons, Dewalt "was entitled to an instructed verdict of not guilty
under both paragraphs of the indictment." Dewalt urges that using this "lesser-included offense" to
"bootstrap" the kidnapping allegations into an aggravated charge violates due process and
double jeopardy. In support for that proposition, Dewalt draws an analogy to the rule that a
defendant's intent to commit an aggravated assault cannot be used to elevate a murder to
felony murder because aggravated assault is a lesser-included offense of murder. See Garrett
v. State, 573 S.W.2d 543, 545 (Tex. Crim. App. 1978). Assuming without deciding the validity of
Dewalt's assertions that interference with child custody, if a lesser-included offense of kidnapping,
cannot be used to aggravate the kidnapping charge, Dewalt has not shown reversible error. (28)

 We first observe that, as the offense is defined in both the indictment and jury charge,
the jury could have convicted Dewalt of aggravated kidnapping without finding that she acted with
intent to commit interference with child custody--it could have found instead that she acted with
intent to interfere with the performance of a governmental function. As previously explained, the
two alternative aggravating factors were submitted in the disjunctive; consequently, Dewalt's
conviction for aggravated kidnapping could stand based solely on the finding that Dewalt acted with
intent to interfere with a governmental function. Dewalt has not challenged the sufficiency of the
evidence supporting this finding. We also note that in the instructed-verdict motion through which
Dewalt raised this complaint below, Dewalt appears to challenge only the first paragraph of the
indictment, which alleged that Dewalt committed kidnapping with intent to facilitate the offense of
interference with child custody, and not to the second paragraph alleging interference with a
governmental function. (29) By failing to challenge the second paragraph of the indictment below,
Dewalt waived that contention. See Tex. R. App. P. 33.1(a)(1). 

 Moreover, we disagree with Dewalt that interference with child custody is a lesser-included offense of kidnapping under the indictment here. An offense is a lesser-included offense
if it is established by proof of the same or less than all the facts required to establish the commission
of the offense charged. Tex. Code Crim. Proc. Ann. art. 37.09(1) (West 2006). "[T]he facts required
to establish the commission of the charged offense" under this analysis refers to the facts as
alleged in the charging instrument. Hall v. State, 283 S.W.3d 137, 157 (Tex. App.--Austin 2008,
pet. denied) (citing Hall v. State, 225 S.W.3d 524, 534-35 (Tex. Crim. App. 2007)). "Therefore, 'the
determination of whether a lesser-included offense is involved should be made by comparing
the elements of the greater offense, as the State pled it in the indictment, with the elements
of the statute that defines the lesser offense.'" Id. (quoting Peavey v. State, 248 S.W.3d 455, 467
(Tex. App.--Austin 2008, pet. ref'd)). This presents a question of law. Id. (citing Hall, 225 S.W.3d
at 535). 

 As noted, to prove the elements of kidnapping under Dewalt's indictment, the State
was required to prove that Dewalt (1) intentionally or knowingly (2) "abducted" J.M.D. by (a)
restricting his movements so as to interfere substantially with his liberty by moving him from one
place to another without Michael's consent or that of his guardian ad litem, (b) with the intent to
prevent his liberation by secreting and holding him in a place where he was not likely to be found. 
Also as previously noted, the penal code provides, and the jury was instructed, that a person can
commit the offense of interference with child custody in two basic ways: 


(a) the person takes or retains a child younger than 18 years when the person:


 (1) knows that the person's taking or retention violates the express terms
of a judgment or order, including a temporary order, of a court
disposing of the child's custody; or


 (2) has not been awarded custody of the child by a court of competent
jurisdiction, knows that a suit for divorce or a civil suit or application
for habeas corpus to dispose of the child's custody has been filed, and
takes the child out of the geographic area of the counties composing
the judicial district if the court is a district court or the county if the
court is a statutory county court, without the permission of the court
and with the intent to deprive the court of authority over the child.


(b) A noncustodial parent commits an offense if, with the intent to interfere with
the lawful custody of a child younger than 18 years, the noncustodial parent
knowingly entices or persuades the child to leave the custody of the custodial
parent, guardian, or person standing in the stead of the custodial parent or
guardian of the child.


Tex. Penal Code Ann. § 25.03(a)-(b) (West Supp. 2008). Proof of kidnapping, as alleged in the
indictment, would not subsume the elements of interference with child custody under either
paragraph (a) or (b). For example, the State could prove kidnapping without proving either the
mens rea required by paragraph (a) (knowing that the taking or retention violates the express terms
of a judgment or order disposing of the child's custody) or the knowing enticement or persuasion
required by paragraph (b). (30) Consequently, the offense of interference with child custody would
not be established by proof of the same or less than all the facts required to establish the commission
of the charged aggravated-kidnapping offense. See Briggs v. State, 807 S.W.2d 648, 652
(Tex. App.--Houston [1st Dist.] 1991, pet. ref'd) (holding that offense of enticing child is not lesser-included offense of interference with child custody); see also Doyle v. State, No. 07-03-0024-CR,
2004 Tex. App. LEXIS 10716, at *12-14 (Tex. App.--Amarillo Nov. 29, 2004, pet. ref'd) (not
designated for publication) (holding that offense of enticing child is not lesser-included offense of
aggravated kidnapping).

 We overrule Dewalt's fourth issue.


CONCLUSION Having overruled each of Dewalt's issues, we affirm the judgment of the
district court.



 __________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: January 22, 2010

Publish
1. Because Michael and Suzanne Dewalt share a common surname, we will use "Michael"
to distinguish him from the appellant. We will similarly use first names to distinguish Dewalt's
parents, Ed and Margaret (Peggy) Kearns.
2. The final decree was rendered by a Nueces County district court.
3. In the interim, Dewalt and J.M.D. had moved at least twice, living in the Austin area 
before ending up in New Braunfels. Consequently, continuing jurisdiction over the suit affecting
the parent-child relationship had been transferred to the Williamson County District Court in 2000,
then to the Comal County District Court in 2001.
4. In the further alternative, the charge inquired as to whether Michael should be named the
joint managing conservator with the exclusive right to determine J.M.D.'s primary residence. The
jury did not reach that issue. 
5. The elements of aggravated kidnapping are (1) intentionally or knowingly (2) "abducting"
another person--the elements of kidnapping--plus (3) committing an aggravating element. See
Tex. Penal Code Ann. § 20.04(a) (West 2003); Laster v. State, 275 S.W.3d 512, 521 (Tex. Crim.
App. 2009); cf. Tex. Penal Code Ann. § 20.03(a) (West 2003) (elements of kidnapping). Chapter 20
of the penal code defines "abduct" in relevant part as "to restrain a person with intent to prevent
his liberation by (A) secreting or holding him in a place where he is not likely to be found." 
Tex. Penal Code Ann. § 20.01(a)(2)(A) (West 2003). "Restrain," in turn, means "to restrict a
person's movements without consent, so as to interfere substantially with the person's liberty,
by moving the person from one place to another or by confining the person." Id. § 20.01(a)(1).
Restraint is "without consent" if it is accomplished by: (A) "force, intimidation, or deception";
or (B) "any means, including acquiescence of the victim," if the victim is a child who is less than
14 years of age and the parent, guardian, or person or institution acting in loco parentis has not
acquiesced in the movement or confinement. Id.
6. See Tex. Penal Code Ann. § 25.03(a)-(b) (West Supp. 2008).
7. As we explain below, the district court had conducted some pretrial hearings in the causes
under the prior indictments. The court's pretrial rulings in those causes, including a significant
ruling limiting Dewalt's presentation of evidence, were carried over into the new cause by
agreement.
8. The record reflects that these and other allegations implicating Dewalt's trial counsel
referred to her primary attorney at the time, a Louisiana lawyer who was appearing pro hac vice.
9. The State also emphasized that Dewalt, along with Veidt and others, had a garage sale
earlier in the month, suggesting that Dewalt was attempting to liquidate assets in preparation for
her flight.
10. There was also testimony that Peggy may have also brought the child to Vaughn's
house on the 24th. 
11. Vaughn indicated that Peggy had brought the child to her home only once previously. 
12. Pearsall is located approximately 55 miles southwest of San Antonio in Frio County.
13. The jury also heard evidence that the Kearnses had continued thereafter in assisting Dewalt
in her efforts to remain in Mexico and avoid capture. Peggy Kearns remained in Mexico, assisting
Dewalt by providing child care for J.M.D., until returning to Comal County in September 2003. 
There was also testimony that during the days immediately following Dewalt and J.M.D.'s
disappearance, Ed Kearns misled Comal County authorities by claiming falsely that Dewalt had
dropped him off at his San Antonio home following trial and concealing his knowledge of her
flight that evening to the border. There was also evidence that Mr. Kearns subsequently sent Dewalt
money in Mexico. The record reflects that the Kearnses were charged and later convicted of offenses
in connection with their actions.
14. Upon his return, J.M.D., Michael testified, continued to insist that his name was
"John Johnson" until Michael convinced him otherwise by showing him his birth certificate.
15. Dewalt's email correspondence recounts an episode in which she "covered up" J.M.D. and
pretended to be asleep when Mexican federal police searched for a "nino" on a bus they were riding. 
In another instance, Dewalt claimed that she and J.M.D. temporarily abandoned their possessions
and went into "hiding" with a friendly pastor after police had knocked on their door at 1:30 a.m. In
regard to both encounters, Dewalt expressed fear that she would be apprehended.
16. This included proof that J.M.D. began stuttering for the first time and exhibited fearful or
aggressive behavior. 
17. Including, in one account, the child's grandmother. 
18. Dewalt also proffered testimony from Michael Bowles that some of Dewalt's evidence
was excluded from the child-custody trial because her Louisiana-based trial counsel failed to respond
to discovery.
19. The district court permitted this limited cross-examination to address a potentially
misleading or one-side portrayal of the custody litigation and Dewalt's motives during the State's
direct examination of Michael. Michael testified that Dewalt had a history of being extremely
contentious regarding custody arrangements, especially his summer extended visitations, and had
disrupted J.M.D.'s prior visits with frequent calls that left the child "curled up on the floor crying"
and exclaiming that he hated Michael and his relatives. Out of what he professed was a desire to
avoid Dewalt's disruptions, Michael admitted that he had misled her about J.M.D.'s whereabouts
during the 2001 summer visitation period by telling her that J.M.D. and he would be visiting
Michael's parents in Fairfax, Virginia, when, in fact, they and other relatives were planning to travel
to Orlando, Florida, for several days for a family wedding. (It was during the Orlando portion of the
visit that Dewalt claims the abuse occurred). Then, immediately following these statements, Michael
testified that Dewalt subsequently filed a "motion to modify" the custody arrangements and that this
proceeding is what led to the trial before Judge Robison.
20. Dewalt made a proffer of cross-examination testimony in which Michael acknowledged
various details of the allegations against him while continuing to deny them.
21. In addition to citing inconsistencies among the abuse allegations that are reflected
in the medical records and investigative reports, the State also emphasized testimony by
Dr. Maureen Adair, a psychiatrist who had been appointed by the court as an independent expert in
the child-custody litigation. Dr. Adair opined that she found no objective evidence that J.M.D.
had been sexually abused and that psychiatric testing she performed on both parents revealed that
Dewalt had difficulty in her perception of reality, along with elevated scales of narcissism and self-centeredness. 
22. The State presented evidence that Dewalt, furious with Michael for misleading her
regarding J.M.D.'s whereabouts during the June 2001 visitation, and accompanied by a friend armed
with a videotape recorder, confronted Michael at the Corpus Christi airport when his return flight
arrived. A confrontation ensued--in J.M.D.'s presence. 
23. The jury was instructed that interference with child custody means:


(a) the person takes or retains a child younger than 18 years when the person:


 (1) knows that the person's taking or retention violates the express terms
of a judgment or order, including a temporary order, of a court
disposing of the child's custody; or


 (2) has not been awarded custody of the child by a court of competent
jurisdiction, knows that a suit for divorce or a civil suit or application
for habeas corpus to dispose of the child's custody has been filed, and
takes the child out of the geographic area of the counties composing
the judicial district if the court is a district court or the county if the
court is a statutory county court, without the permission of the court
and with the intent to deprive the court of authority over the child.


(b) A noncustodial parent commits an offense if, with the intent to interfere with
the lawful custody of a child younger than 18 years, the noncustodial parent
knowingly entices or persuades the child to leave the custody of the custodial
parent, guardian, or person standing in the stead of the custodial parent or
guardian of the child.


This definition tracks the penal code. See Tex. Penal Code Ann. § 25.03(a)-(b).

 The court also instructed the jury that Dewalt had the right under her final divorce decree to
determine J.M.D.'s residence "until changed by Order of Judge Robison on October 25, 2002, at
9:40 p.m." at which time Michael "was appointed sole managing conservator with the right to
determine the residence of [J.M.D.] and that right continues to this date."
24. On appeal, the State joins issue with respect to only the first of the three statutory elements
of necessity and also questions whether Dewalt presented evidence conceding that she committed
aggravated kidnapping. As noted, Dewalt contested at trial whether the State had proven her specific
intent to interfere with child custody or a governmental function. In contending on appeal that she
admitted the offense, Dewalt cites her testimony during the pretrial hearing, in which she admitted
that she took J.M.D. to Mexico; her counsel's similar concession during closing argument; and
testimony she proffered at trial that she "engaged in the proscribed conduct because as a mother she
was compelled to protect her child [J.M.D.] from what she reasonably believed to be a threat of
imminent death or serious bodily injury to herself or [J.M.D.]" We express no opinion as to whether
this evidence sufficiently "admits" each element of the charged offense of aggravated kidnapping. 

25. Cf. Vasquez v. State, 830 S.W.2d 948, 950-51 (Tex. Crim. App. 1992) (error to refuse
necessity instruction where defendant testified that he was unlawfully carrying firearm while fleeing
from kidnappers who would shoot him if they saw him); Pennington v. State, 54 S.W.3d 852, 858
(Tex. App.--Fort Worth 2001, no pet.) (error to refuse necessity instruction in drug-possession case
where defendant presented evidence she had fled house with drugs less than ten minutes earlier to
prevent child in same home from viewing them).
26. The jury was instructed:


 A person is criminally responsible as an "individual" if the results would not
have occurred but for her conduct.


 A person is criminally responsible as a "'party" to an offense if the offense
is committed by his or her own conduct, or by the conduct of another for whom she
is criminally responsible, or by both. Each party to an offense may be charged with
the commission of the offense.


 Mere presence alone will not make a person a party to an offense. A person
is criminally responsible for an offense committed by the conduct of another if,
acting with intent to promote or assist the commission of the offense, she solicits,
encourages, directs, aids or attempts to aid the other person to commit the offense. 
27. In this regard, the State observes that the legislature expressly comprehended that the
"means" by which a "restraint" can be accomplished can include "deception." See Tex. Penal Code
Ann. § 20.01(1)(A). 


 The State also argues that under the law of parties instruction, the jury could have found
that the restraint began to be accomplished in both Bexar County, where J.M.D. was physically being
held, as well as Comal County, where there was evidence Dewalt was soliciting, encouraging, and
directing her cohorts' movement and confinement of J.M.D. and aiding those actions through such
means as misleading Judge Robison and others regarding J.M.D.'s location. We need not reach that
contention. 
28. We note that this is not a case where Dewalt has been convicted and punished for both
offenses. Nor did Dewalt seek a lesser-included offense instruction.
29. Similarly, Dewalt had also moved unsuccessfully to quash the indictment on the ground
that "Interference With Child Custody, while not a lesser-included offense of Kidnapping, is not a
valid felony for the enhancement of Kidnapping to Aggravated Kidnapping" because the elements
of kidnapping and interference with child custody, "particularly as they are applied to the facts of
this case, are almost identical."
30. In her reply brief, Dewalt analyzes this issue by comparing the statutory elements of
interference with child custody to the elements of aggravated kidnapping as alleged in the
indictment--including the aggravating factor of intent to facilitate the offense of interference with
child custody. Dewalt's analysis is thus circular--she suggests that interference with child custody
cannot be used to aggravate a kidnapping charge because the elements of aggravated kidnapping,
including the aggravating factor of intent to commit interference with child custody, subsumes
proof of interference with child custody. This analysis misses or obscures the point of Dewalt's own
argument, which is that interference with child custody is a lesser-included offense of kidnapping
and, for that reason, cannot be used to aggravate that offense.